PUBLISH

# UNITED STATES COURT OF APPEALS

Filed 11/13/96

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

       Plaintiff - Appellant,

v.

NAFIS OMAR SHAREEF, also known as Kenneth Hultman, also known as James Russell McCellen, also known as Donald James Simmons; WILLIAM D. SMITH, also known as Mark Killingsworth; JOSEPH BROWN; CHESTER RAYMOND PITTS, also known as David Wayne Drare; SPERGEON WILLIE MURPHY; ALICIA D. NASH, also known as Laura Ann Bohland,

       Defendants - Appellees.

No. 95-3381

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 95-40022-06-RDR)**

---

Richard A. Friedman, United States Department of Justice, Washington, D.C. (Randall K. Rathbun, U.S. Attorney, and Gregory G. Hough, Office of the U.S. Attorney, Topeka, KS, with him on the brief) for Plaintiff-Appellant.

Charles D. Dedmon, Office of the Federal Public Defender, Topeka, KS (David J. Phillips, Federal Public Defender, Kansas City, KS, with him on the brief) for Defendant-Appellee Nafis Omar Shareef.

J. Richard Lake, Holton, KS, for Defendant-Appellee William D. Smith.

Jenine M. Jensen, Office of the Federal Public Defender, Denver, CO (Michael Gordon Katz, Federal Public Defender, Denver, CO, with her on the brief) for Defendant-Appellee Joseph Brown.

Michael M. Jackson, Topeka, KS, for Defendant-Appellee Chester Raymond Pitts.

Melanie S. Morgan, Topeka, KS (Joseph D. Johnson, Topeka, KS, with her on the brief) for Defendant-Appellee Spergeon Willie Murphy.

F.G. Manzanares, Topeka, KS (Stephen W. Kessler, Topeka, KS, with him on the brief) for Defendant-Appellee Alicia D. Nash.

---

Before **EBEL, LOGAN** and **BRISCOE**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

This case presents the difficult question of how much force police officers may use to detain individuals following a lawful traffic stop when the officers have reasonable suspicion that the individuals are involved in criminal activity, but the suspicion has not yet ripened into probable cause to arrest. The district court found the police officers' conduct in detaining the defendants to be unreasonable and suppressed evidence discovered during the investigative stop. The government now appeals. We have jurisdiction pursuant to 18 U.S.C. § 3731, and we REVERSE and REMAND for further proceedings.

## I.

"When reviewing an order granting a motion to suppress, we accept the trial court's factual findings unless clearly erroneous, and we view the evidence in the light most favorable to the district court's ruling." United States v. Little, 18 F.3d 1499, 1503 (10th Cir. 1994). The facts adduced at the suppression hearings are as follows. At approximately 3:30 a.m. on March 5, 1995, Marysville police officer Mark Maschmeier was operating stationary radar from his patrol car at an intersection in Marysville, Kansas. Sergeant Jerry Reinhart was sitting in his own patrol car next to Maschmeier's car, and the two were talking. Officer Maschmeier clocked a large four-door vehicle traveling westbound at 43 m.p.h in a 30 m.p.h. zone. Approximately two to three lengths behind the first car was a U-Haul truck. The radar showed the U-Haul traveling at 41 m.p.h. Another dark four-door car, also traveling at 41 m.p.h., was following the U-Haul.

Intending to stop all three vehicles, Maschmeier drove behind the third car and activated his emergency lights. The cars did not pull over or decrease their speed. Officer Maschmeier then passed two of the vehicles and pulled in behind the first car, which finally pulled over in response to his lights and short bursts of his siren. The other two cars then pulled over as well. Sergeant Reinhart, who had followed the chase, stopped nearby.

Officer Maschmeier approached the first vehicle, a Lincoln Continental, in which defendants Smith, Murphy, and Nash were riding. The driver identified himself as

William D. Smith and gave his date of birth as September 2, 1956. Smith stated that he did not have his California driver's license with him. Officer Maschmeier told Smith that he was going to issue a speeding citation to him, and returned to his patrol car to write the ticket. Officer Maschmeier relayed Smith's name, birth date, and reported state of licensure to Renae Kenworthy, the dispatcher. Kenworthy ran a driver's license check and a check for outstanding warrants. She determined that California did not show a driver's license for a William D. Smith, and communicated this to Officer Maschmeier at 3:40 a.m. Maschmeier continued writing the speeding ticket and returned to the Lincoln. To complete the ticket, he obtained additional information from Smith, including Smith's address, height and weight. Smith gave his height as six feet and his weight as 205 pounds; in addition Maschmeier noted that Smith was a black male. Officer Maschmeier asked Murphy, the front-seat passenger, if he had a driver's license. Murphy replied that he did. Officer Maschmeier asked him to switch places with the driver. Officer Maschmeier then told Smith (now in the passenger seat) to pull over to the side of the road. Smith asked why, and Officer Maschmeier replied that he was going to issue tickets to the other two drivers. Smith told Officer Maschmeier that he didn't have to write citations for the other two vehicles. The Lincoln pulled into a parking area at the side of the road and waited.

Officer Maschmeier then approached the U-Haul truck, in which defendants Shareef and Pitts were riding. Maschmeier told the driver he was going to issue a

- 4 -

speeding citation to him. The driver identified himself as Nafis O. Shareef and provided a date of birth. Shareef stated that he did not have his California driver's license with him. Officer Maschmeier told Shareef to wait and proceeded to the third vehicle, a Pontiac Bonneville. The driver of the Pontiac stated that he did not have a license with him, and Officer Maschmeier told him to wait. The driver was defendant Joseph Brown, although Officer Maschmeier did not ask Brown for his name at that time. Officer Maschmeier returned to his patrol car. He told Sergeant Reinhart, who also had returned to his own patrol car, that something was strange about the situation. At 3:43 a.m., Maschmeier asked dispatcher Kenworthy to run a license check on Shareef and vehicle registration checks on the U-Haul and the Pontiac. Sergeant Reinhart informed the dispatcher that all three cars were stopped for speeding and none of the drivers was carrying a driver's license. The dispatcher reported that the computer used for retrieving the criminal history and warrants information was temporarily not responding.

Before the computer checks for licensure and vehicle registration had been completed, and while Officer Maschmeier was still writing the citation for Shareef, the dispatcher received a teletype from the National Crime Information Center ("NCIC") computer. The teletype was received at approximately 3:55 a.m. It identified two individuals born on September 2, 1956, with the last name of Smith who had outstanding warrants. The first name on the list was Karlton Wilbur Smith, described as a black male, six feet tall, weighing 175 pounds, who was wanted on a weapons charge in

- 5 -

Florida.  The teletype listed eighteen aliases for Karlton Wilbur Smith.[1]  The agency that had issued the warrant was the Bureau of Alcohol Tobacco and Firearms ("ATF").  The second name on the list was Gary J. Smith, described as a white male, five feet ten inches tall, weighing 160 pounds, wanted by the Metro-Dade Police Department in Miami Florida for parole violation.

Upon receiving the teletype, the dispatcher radioed Sergeant Reinhart and asked him if he was "10-12," indicating that she had private information to relay.  The communication was switched to a telephone line, and the dispatcher and Reinhart had the following conversation:

Kenworthy:   Wanted person caution-- just a second let me finish reading um caution-- Wilbur Smith is he a black male?
Reinhart:     Yep.
Kenworthy:   Black male, height six foot one hundred seventy five pounds.
Reinhart:     From the Lincoln?  Is that who we are talking about?
Kenworthy:   Um.  This would be the first 27 [driver's license check] or 28 [registration check] that . . . you wanted.  And my second person is also--
Reinhart:     Your what?
Kenworthy:   The second one he wanted ran--
Reinhart:     Oh, O.K.
Kenworthy:   Is also.  Um it's just pert-near everything they're wanted for.  Armed and dangerous.
Reinhart:     They're armed and dangerous?
Kenworthy:   That's what they have, possession of firearms.  Hold for U.S. Marshals, Miami, Florida.

---

[1]Carl James Smith, Carson Smith, Carlton Smith, Charlton W. Smith, Karl Wilbert Smith, Karlton Wilber Smith, Karson W. Smith, Charleston Smith, Barry Simms, Bernard Edwards, Charleston Willie Smith, James Carl Smith, Karlton Smith, Karlton Wiber Smith, Karson Smith, Carl Dawkins, Benny Bain and Karlton W. Smith.

Reinhart:      Hold for U.S. Marshals, Miami Florida?
Kenworthy:   Uh huh.
Reinhart:      Call 10 [Police Chief Brian Davidson] and 14 [Officer Brian Kenworthy].
Kenworthy:   O.K., you got it.
Reinhart:      ASAP, please
Kenworthy:   Got it.

From this conversation, the district court determined that the dispatcher, who was not licensed to operate the NCIC computer, made a number of errors in interpreting the report. She assumed that the first name of the driver of the Lincoln was Wilbur, rather than William. She further assumed that the report indicated that two of the suspects had outstanding warrants, although she had been told by Maschmeier that the driver of the U-Haul was named Shareef not Smith. In a subsequent transmission with the dispatcher, Reinhart realized that they had only one "hit," as all the suspects were black and Gary Smith was white.

Reinhart informed Maschmeier that there was an NCIC "hit" on the driver of the Lincoln, who was wanted on a weapons charge in Florida. Reinhart told Maschmeier to return to his patrol car, pretend to write the speeding citations, and wait for backup officers to arrive. The dispatcher, meanwhile, contacted several officers and asked them to proceed to the scene. These calls were completed by 4:06 a.m.

Shortly before 4:15 a.m., backup arrived and the officers began a "felony stop" of the occupants of all three vehicles. The officers, using the public address system on their cars, ordered the drivers to throw their car keys outside. Each occupant was told to exit

the vehicle on the driver's side with his or her hands in the air and to move backward toward the police vehicles. Upon reaching the police cars, each defendant was patted down, handcuffed and told to kneel on the pavement behind the patrol cars. During the procedure, which took approximately five minutes for each defendant, the officers had their guns drawn and pointed at the defendants. After each vehicle was emptied, the vehicle was cleared by shining a light inside to make sure that there were no other people inside. The officers holstered their guns after all the defendants were removed from the vehicles.

By the time the procedure was completed, nine officers were on the scene. Defendant Nash was unhandcuffed and placed back in the Lincoln when officers were informed that she was pregnant. The other five defendants remained handcuffed. Defendants Smith and Murphy were placed in a patrol car when they complained of being cold.

After the defendants were removed from their vehicles, the officers began to question them. Marshall County Sheriff Kenneth Coggins asked Shareef who had rented the U-Haul. Shareef told him that he did not know, and that he had just been hired to drive it. Sheriff Coggins asked for consent to search the truck, but Shareef declined, saying that he could not give consent because he did not rent the truck.

Marshall County Deputy Scott Tormondson approached Shareef and asked him his name. Shareef said his name was "Big Bear." Deputy Tormondson asked for permission

to search the U-Haul.  Shareef said that he could not give permission because he did not know anything about the vehicle.  He said that he did not know who had rented the truck, and that he had just been walking down the road when somebody picked him up and asked him to drive it from St. Louis to California.  Shareef directed Deputy Tormondson to talk with the driver of the Lincoln (Smith).  Deputy Tormondson asked Smith, who was seated in a patrol car, who had rented the U-Haul.  Smith said that he did not know, but that the "stuff" in the truck belonged to his sister and was being driven from St. Louis to California.  Deputy Tormondson asked Smith his sister's name, but Smith did not respond.  Tormondson returned to Shareef and again asked for consent to search the U-Haul, telling him that he was the driver and in control.  Shareef responded: "Go ahead.  I don't know anything about it."

Deputy Tormondson looked in the cab of the U-Haul and found the rental papers. He also found, under the seat on the passenger side, the key to the back of the truck.  He opened the rear of the truck, where he discovered televisions, video equipment, cellular telephone equipment, some luggage and a briefcase.  The briefcase contained photo identification cards and a six-inch stack of credit cards in different names.  At least one photo identification card had a photo that resembled defendant Smith, but had a different name and date of birth.  Deputy Tormondson asked Smith about the card.  Smith said that he knew nothing about it.

Marysville Chief of Police Bryan Davidson questioned Brown (the driver of the Pontiac) and Smith. Brown said that they were driving from St. Louis to California and indicated that they were helping a friend's sister move. Chief Davidson asked Smith his name and date of birth, and checked the status of Smith's driver's license check with the dispatcher. Chief Davidson also asked Smith where he would find the rental agreement for the Lincoln. Smith replied that it was in the Lincoln's glove compartment and that Chief Davidson could look for it. Chief Davidson sent an officer to retrieve the papers.

Shortly before 5:00 a.m., Chief Davidson learned that Smith's license had been suspended and told Smith that he was under arrest. Davidson retrieved the rental agreements from the vehicles and discovered that they were leased to individuals named Adams and Fawcett. Chief Davidson asked Brown, Pitts, and Shareef about these names. They indicated that they were unfamiliar with them. Chief Davidson then asked Smith about the names. Smith indicated that Adams might be a boyfriend of his sister.

Officer Terry Douglas questioned Brown, who was in a patrol car along with Pitts. Brown told Officer Douglas that he was the driver of the Pontiac. In response to Officer Douglas's request to search the car, Brown told him to go ahead. Officer Douglas found a cellular telephone, clothes, toys, and the rental agreement, which was not in the name of any of the defendants. He gave that rental agreement to Chief Davidson.

At approximately 5:00 a.m., the ATF informed the dispatcher that William D. Smith was not the Karlton Wilbur Smith who was wanted for weapons charges in Florida.

The dispatcher relayed this information to Chief Davidson. At approximately 5:15 a.m., Chief Davidson telephoned the leasing agencies of the three vehicles and was asked to seize the vehicles. At approximately 5:30 a.m., the defendants were taken to the Marysville Police Department. The Lincoln and the U-Haul later were searched pursuant to the Marysville Police Department inventory policy.

The defendants were charged with three counts of transporting a stolen motor vehicle in interstate commerce, in violation of 18 U.S.C. § 2312, when it was discovered that the vehicles were rented using counterfeit or stolen credit cards. The defendants filed motions to suppress all evidence obtained as a result of their detention. After three days of suppression hearings, the judge ordered suppression of all physical evidence obtained from the vehicles, as well as all statements made by the defendants after being removed from their vehicles. The government brings this interlocutory appeal pursuant to 18 U.S.C. § 3731.[2]

---

[2] 18 U.S.C. § 3731 provides that the United States may appeal a district court's order suppressing evidence "if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material to the proceeding." Although the government timely filed a notice of appeal in which it certified that the appeal was taken in good faith and not taken for purposes of delay, it failed to certify that the evidence is "substantial proof of a material fact." It corrected this error in an amended notice of appeal filed shortly after the expiration of the thirty day filing period. The defendants argue that we should dismiss this appeal because of the incomplete certification.

While the lack of a Section 3731 certificate does not deprive this court of jurisdiction, United States v. Welsch, 446 F.2d 220, 224 (10th Cir. 1971), we have in the past exercised our discretion to dismiss a government appeal because of such a defect.

(continued...)

- 11 -

**II.**

The Fourth Amendment protects individuals from unreasonable searches and seizures. "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." Wilson v. Arkansas, 115 S. Ct. 1914, 1916 (1995) (quoting New Jersey v. T.L.O., 469 U.S. 325, 327 (1985)). We review de novo the district court's determination of whether police conduct was reasonable under the Fourth Amendment. Ornelas v. United States, 116 S. Ct. 1657, 1662 (1996); United States v. McRae, 81 F.3d 1528, 1533 (10th Cir. 1996). At issue here are the searches of the three vehicles and the seizure of the defendants and their vehicles.

*A.    Defendants' Standing To Challenge the Searches*

Whether a defendant has standing to challenge a search is a legal question subject to de novo review. United States v. Eylicio-Montoya, 70 F.3d 1158, 1161 (10th Cir. 1995). The district court concluded that the defendants lacked standing to challenge directly the searches of the vehicles. Defendants do not contest that conclusion on appeal.

---

[2](...continued)
See United States v. Carrillo-Bernal, 58 F.3d 1490 (10th Cir. 1995); United States v. Hanks, 24 F.3d 1235 (10th Cir. 1994). Here, however, the government did not neglect timely to file a certificate; rather, it timely filed an incomplete certificate which it promptly corrected. The government has provided this court, in response to defendants' motion to dismiss, an affidavit representing that the Assistant United States Attorney undertook the analysis required by the statute before filing the interlocutory appeal. We are satisfied that the government's decision to appeal "was preceded by a reasoned determination as to the [§ 3731 factors]." Carrillo-Bernal, 58 F.3d at 1494, and that it took seriously its obligations under the statute. We therefore decline to dismiss this appeal merely because of the government's technical error.

In any event, we agree with the district court. A defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched. Id. at 1162. In Rakas v. Illinois, 439 U.S. 128, 148-49 (1978), the Supreme Court held that a passenger who asserts neither a possessory nor a property interest in a vehicle would not have a legitimate expectation of privacy in the vehicle protected by the Fourth Amendment. Accordingly, we have held that "a defendant in sole possession and control of a car rented by a third party has no standing to challenge a search or seizure of the car." United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995). Defendants here have not demonstrated that they had a legitimate possessory or ownership interest in the rented cars; accordingly, they lack standing to challenge the searches of the vehicles.

Defendants do, however, have standing to challenge their detention. We "distinguish passenger standing to directly challenge a vehicle search from passenger standing to seek suppression of evidence discovered in a vehicle as the fruit of an unlawful stop, detention, or arrest." Eylicio-Montoya, 70 F.3d at 1162. If the physical evidence found in the vehicles was the fruit of the defendants' unlawful detention, it must be suppressed. Id. at 1162-64; United States v. Miller, 84 F.3d 1244, 1250 (10th Cir. 1996). This requires a two part inquiry: first, whether the defendants were unlawfully detained, and second, whether the discovered evidence was the fruit of that unlawful detention. Miller, 84 F.3d at 1250. Only if both of those questions are answered in the affirmative will the physical evidence found in the vehicles be suppressed.

*B.*     *The Detention of the Defendants*

In determining whether a seizure comports with the Fourth Amendment, courts have identified three categories of police-citizen encounters: "(1) consensual encounters which do not implicate the Fourth Amendment . . . (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity . . . and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." United States v. Davis, 94 F.3d 1465, 1467-68 (10th Cir. 1996) (citations omitted).  These categories are not static.  A consensual encounter may escalate into an investigative detention.  An investigative detention may escalate into a full-blown arrest, or it may de-escalate into a consensual encounter.   A reviewing court must analyze each stage of the encounter, ensuring that the requisite level of suspicion or cause is present at each stage.   We believe the encounter between the officers and the defendants unfolded in three stages: (1) the initial stop;  (2) the forcible removal of the defendants from their vehicles following the receipt of the NCIC information; and (3) the subsequent detention of defendants in handcuffs, while the police questioned them and ultimately transported them to the police station.

1.     The initial stop

A routine traffic stop is a seizure within the meaning of the Fourth Amendment. United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc), cert. denied,

116 S. Ct. 2529 (1996). Such a stop "is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." Id. at 787. See also Whren v. United States, 116 S. Ct. 1769 (1996) (detention of motorist supported by probable cause to believe motorist committed traffic violation was reasonable under Fourth Amendment). Defendants do not contest on appeal the district court's finding that each vehicle was traveling faster than 40 m.p.h. in a zone where the posted speed limit was 30 m.p.h. Accordingly, the officers validly stopped all three vehicles for speeding.

An ordinary traffic stop is more analogous to an investigative detention than to a custodial arrest. Jones, 44 F.3d at 871. We therefore analyze such stops under the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968). In evaluating the reasonableness of an investigative detention, we make a dual inquiry, considering first "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. "The government has the burden of demonstrating that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993). If the detention is not so limited, the stop may only be justified by probable cause or consent. Id. We already have determined that

the stop was justified at its inception, because the officers observed traffic violations.  We therefore turn to the second prong of the Terry inquiry: the scope of the detention.

We have repeatedly stated that:

[a]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation.  When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir.) (citation omitted), cert. denied, 114 S. Ct. 1862 (1994).   However, after an officer issues the citation and returns any materials provided, the driver is illegally detained only if the driver has objectively reasonable cause to believe that he or she is not free to leave.  United States v. Turner, 928 F.2d 956, 959 (10th Cir.), cert. denied, 502 U.S. 881 (1991).

Smith, the driver of the Lincoln, was stopped for speeding and failed to produce a valid driver's license.  Officer Maschmeier issued a citation to him and told him to pull into a parking area  to wait while the officer issued citations to the drivers of the other two vehicles.  The district court found that the "manner of [the officer's] request did not indicate that he was directing the driver of the Lincoln to wait for further instructions from him."  Dist. Ct. Mem. & Order at 20.  Rather, the court found that the request was merely a suggestion based upon the officer's reasonable belief that the cars were traveling together.  The court also noted that the officer had allowed defendant Murphy, who had said that he had a license, to take the driver's seat.  From all the circumstances, the court

found that a reasonable person would have believed Smith and Murphy were free to leave. Because these findings are not clearly erroneous, we affirm the district court's finding that the Lincoln was not detained at this point.

The remaining defendants were detained while the officers prepared to issue citations to the two remaining drivers and ran computer checks on defendant Shareef and on the remaining vehicles. Clearly, the officers' actions were within the bounds of a permissible traffic stop because the three cars were clocked driving in excess of the posted speed limit. In addition, here the officers had reasonable suspicion not only that a minor traffic law had been violated, but also that all the participants were engaged in other unlawful activity. The three cars (including a U-Haul trailer) were traveling in an obvious convoy in the middle of the night. The cars did not pull over immediately when officer Maschmeier signaled. None of the drivers had produced a license. Officer Maschmeier reasonably believed that one of the drivers, Smith, had lied about being licensed in California. Thus, under the circumstances, a longer detention for careful investigation was justified than might be warranted under other circumstances. See Jones, 44 F.3d 860, 872 (30-minute detention to verify validity of license and authority to operate rental car held proper).

The time needed to verify the defendants' authority to drive was extended because the defendants failed to produce licenses. When a defendant's own conduct contributes to a delay, he or she may not complain that the resulting delay is unreasonable. United

States v. Sharpe, 470 U.S. 675, 699-700 (1985) (Marshall, concurring); see also Jones, 44 F.3d at 872.  Furthermore, there was evidence in this case that the computers used to verify license information were down or slow.  See United States v. Rutherford, 824 F.2d 831, 834 (10th Cir. 1987) (one-hour investigative stop prior to arrest upheld when nearly one half-hour was occasioned by problems with the police computer, and officers had received tip that implicated defendant in drug trafficking, defendant failed to stop when signaled by police, and there were inconsistencies between vehicle's license plate and registration).  Although a driver who is not carrying a license may not be detained indefinitely, a detention of thirty minutes,[3] given the totality of the circumstances present here, was reasonable.  We therefore conclude that during this period, the detention remained within the boundaries of a permissible stop.

2.    The felony stop

At 3:55 a.m., the officers at the scene received information that led them to believe that defendant Smith was armed and dangerous.  The defendants in the Pontiac and the U-Haul were detained for an additional fifteen minutes while the officers waited for backup.  All six defendants then were forcibly removed from their vehicles at gun point, patted down, handcuffed, and ordered to kneel on the pavement until the procedure was completed at approximately 4:45.  The district court concluded that this use of force transformed the lawful stop into an unlawful arrest.

_____

[3]The officers were informed of the NCIC "hit" at 3:55 a.m.

We have stated that "[s]ince police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a Terry] stop." Perdue, 8 F.3d at 1462. "[T]he use of firearms, handcuffs, and other forceful techniques does not necessarily transform a Terry detention into a full custodial arrest--for which probable cause is required--when the circumstances reasonably warrant such measures." United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994) (internal quotation marks omitted). Such measures are warranted, however, only if "the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." Id. (internal quotation marks and citations omitted).

The district court held that the identification of William Smith as the individual referenced in the NCIC teletype was unreasonable. The court found that the officer and dispatcher had confirmed only two pieces of information in the teletype, the birth date and the surname "Smith." Because "Smith" is a common name, the court reasoned that the likelihood of a match to the defendant was remote. The court found a lack of similarity between the name William Smith and any of the aliases, and further found that officer Reinhart behaved unreasonably in failing to confirm the physical description of the suspect with Maschmeier, the only officer who was aware of Smith's height and weight. The court concluded that the NCIC teletype could not provide the officers with a

reasonable and articulable suspicion that defendant Smith was armed and dangerous.  Cf. Melendez-Garcia, 28 F.3d at 1052-53 (felony stop unreasonable when "there was no evidence or testimony from the police that they had reason to believe these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness" of the felony stop procedures).

The district court went on to consider whether a dispatcher's error should lead to application of the exclusionary rule.  See Arizona v. Evans, 115 S. Ct. 1185 (1995) (holding error by court employee does not require application of exclusionary rule ).  In Evans, the Supreme Court reiterated that the purpose of the exclusionary rule is to "safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect."  Id. at 1191.  The Court refused to apply the rule when a violation of the Fourth Amendment resulted from the error of a court employee in failing to note in the court records that an outstanding warrant had been quashed.  Id. at 1193.  The Court found that such employees "are not adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime."  Id.  Therefore, applying the rule in that context would serve no deterrent purpose.  Id. at 1193.

The district court distinguished Evans and held that the exclusionary rule should be applied when a dispatcher's error leads to a violation of the Fourth Amendment.  The court reasoned that while a dispatcher is not a law enforcement officer,

> she is clearly an "adjunct[] to the law enforcement team engaged in the often competitive enterprise of ferreting out crime." [Id.] Her status differs significantly

> from the court employees involved in <u>Evans</u>. The dispatcher is in a position of extreme importance to the police since she is responsible for obtaining, relaying and recording information to and from the officers in the field. . . .
>
> This decision will no doubt cause law enforcement agencies to ensure that dispatchers are properly trained and capable of handling their duties. . . . In sum, this decision should have a deterrent effect on law enforcement agencies.

Dist. Ct. Mem. & Order at 40. We agree with the district court that the exclusionary rule applies when an error by a dispatcher or an officer leads to a Fourth Amendment violation. <u>See also State v. White</u>, 660 So.2d 664 (Fla. 1995) (applying exclusionary rule where failure of police personnel to maintain accurate computer records leads to violation of Fourth Amendment).

In the present case, however, we find the officer's and the dispatcher's conclusion that they had an NCIC "hit" reasonable. Thus no violation of the Fourth Amendment occurred. Although the name in the NCIC teletype, Karlton Wilbur Smith, was not identical to the defendant's name, William D. Smith, the report listed 18 aliases, of which several resemble "William," and one of which was "Willie." In addition, the officer accurately confirmed four, not two, pieces of information in the teletype: the defendant's last name, date of birth, sex and race.

The district court found that Sergeant Reinhart did not know defendant Smith's height or weight. Therefore, the court refused to consider the similarity in height and weight between the defendant and Karlton Smith in determining whether the officer's conduct was reasonable. The government, however, urges us to look to the "collective

knowledge" of the officers to determine whether their conduct was reasonable, and to attribute Officer Maschmeier's knowledge of defendant Smith's height and weight to Sergeant Reinhart.

We have said that in assessing the justification for an investigatory stop, we "look to the knowledge of all the police involved in [the] criminal investigation." United States v. Merritt, 695 F.2d 1263, 1268 (10th Cir. 1982), cert. denied, 461 U.S. 916 (1983). However, this concept has limits. The cases in which we have applied the "collective knowledge" rule all have involved actual communication to the arresting officer of either facts or a conclusion constituting probable cause, or an arrest order.[4]  See, e.g., United States v. Maestas, 2 F.3d 1485, 1493 (10th Cir. 1993) (where roving agents communicated facts to fixed checkpoint, information collected by all agents could be pooled "to establish the requisite quantum of suspicion"); United States v. Matthews, 615 F.2d 1279, 1284 n.5 (10th Cir. 1980) (information collected by several officers considered in determining probable cause, because officers "shared the various pieces of information with each other"); United States v. Goeltz, 513 F.2d 193, 197 (10th Cir.) (finding probable cause based on collective knowledge of officers on the scene where

_____

[4] It is well-established that when an order to stop or arrest a suspect is communicated to officers in the field, the underlying facts constituting probable cause or reasonable suspicion need not be communicated, so long as the individual or agency issuing the order can justify the intrusion on Fourth Amendment rights. United States v. Hensley, 469 U.S. 221, 231 (1985). We note that appellants have not challenged the existence of probable cause supporting the ATF request to arrest Karlton Smith.

each officer "communicated his observations to his associates"), cert. denied, 423 U.S. 830 (1975); Wood v. Crouse, 436 F.2d 1077 (10th Cir.) (arresting officer may rely on sheriff's arrest order where sheriff has probable cause), cert. denied, 402 U.S. 1010 (1971).

In this case, however, the district court found that Officer Maschmeier had not communicated defendant Smith's height and weight to Sergeant Reinhart. Our prior cases have not considered whether a stop or an arrest can be justified by looking to the collective knowledge of officers, absent evidence that the officers communicated with each other, or, as here, in the face of a specific finding that they have not communicated. Other Courts of Appeals to consider this issue have allowed the knowledge of officers working closely together on a scene to be mutually imputed without requiring proof of actual communication, see, e.g., United States v. Edwards, 885 F.2d 377, 383-383 (7th Cir. 1989) (imputing knowledge of one arresting officer to another because officers "made the arrest together"), and even in the face of a specific finding that pertinent facts were not communicated, see Collins v. Nagle, 892 F.2d 489, 495 (6th Cir. 1989) (knowledge of investigators working together on the scene is "mutually imputed"). Cf. United States v. Kapperman, 764 F.2d 786, 791 fn.5 (11th Cir. 1985) (looking to collective knowledge of officers where there was "minimal" communication between officers); United States v. Nafzger, 974 F.2d 906, 911 (7th Cir. 1992) ("[W]hen officers are in communication with each other while working together at a scene, their knowledge

may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed . . . ").  Other courts reject the idea of imputing knowledge, even among officers working closely together.  United States v. Del Porte, 357 F. Supp. 969, 974 (S.D. N.Y.), aff'd, United States v. St. Jean, 483 F.2d 1399 (2d Cir. 1973);  State v. Cooley, 457 A.2d 352 (Del. 1983);  People v. Brnja, 406 N.E.2d 1066 (N.Y. 1980).[5]   And even courts that impute knowledge among officers working closely together will not do so absent a close working nexus between the officers during the stop or arrest.  See, e.g., Edwards, 885 F.2d at 382 ("A supervising officer's knowledge about a defendant cannot be relied upon to provide probable cause for his arrest where there is no evidence that such knowledge was communicated to the agents on the scene who actually made or ordered the defendant's arrest.");  accord United States v. Woods, 544 F.2d 242, 260 (6th Cir. 1976), cert. denied, 431 U.S. 954 (1977).

---

[5]The Cooley court explained:

> When an officer makes an arrest without first obtaining judicial approval in the form of a warrant, the officer acts in the stead of a magistrate.  If "no officer connected to the arrest knows the facts which might justify it, no officer exercises the judgment required as a substitute for judicial approval. Information scattered among various officers in a police department cannot substitute for possession of the necessary facts by a single officer related to the arrest."

457 A.2d at 355-56 (quoting Commonwealth v. Gambit, 418 A.2d 554, 557 (Pa. Super. Ct. 1980)) (internal citations omitted).

We can see the value in imputing knowledge among officers working closely together. A presumption of communication often will reflect what has actually taken place and communication among officers during the exigencies of a stop or arrest may often be subtle or nonverbal. However, in this case, the presumption of communication is rebutted, because the district court found that in fact the information had not been shared. Even in the absence of evidence of communication among officers, however, when officers act collectively it may sometimes be appropriate to look to their collective knowledge in determining whether they behaved reasonably. For example, where two officers are working closely together at the scene and each has observed suspicious circumstances that the other has not observed, even absent evidence of communication between the officers, we might be willing to aggregate their knowledge in deciding whether they behaved reasonably.[6] That is not the case here, however. The district court found that Officer Maschmeier alone knew defendant Smith's height and weight; Sergeant Reinhart alone knew the height and weight listed on the NCIC report. Thus neither officer knew the significance of the information, and the information could contribute to neither officer's suspicion of the suspect. Under these circumstances, we decline to hold that Officer Maschmeier's knowledge of Smith's height and weight can be attributed to Sergeant Reinhart or that the similarity between the defendant's and Karlton

---

[6]We might do so on the theory that officers working closely together during a stop or an arrest can be treated as a single organism. Further, we recognize that such officers convey suspicions through nonverbal as well as verbal cues.

Smith's height and weight could contribute to the officers' reasonable suspicion that defendant Smith was wanted in Florida.

However, even excluding the evidence of height and weight to bolster the likelihood of a match between Smith and the Karlton Smith in the NCIC teletype, we conclude that the other similarities between Smith and Karlton Smith, when considered together with the defendants' other suspicious conduct, gave the officers reasonable suspicion that defendant Smith was the individual in the teletype, and was armed and dangerous. In determining whether an officer has reasonable suspicion, we examine the "totality of the circumstances." McRae, 81 F.3d at 1534 (citing United States v. Fernandez, 18 F.3d 874, 878 (10th Cir. 1994)). In addition to the NCIC information which matched defendant Smith as to last name, exact birth date, race, sex and similarity of aliases, the officers knew that the defendants were traveling in a convoy, had failed to stop when the officer signaled, had failed to produce driver's licenses, and had lied to officer Maschmeier. See Sharpe, 470 U.S. at 682 n.3 (pickup trucks with camper shells traveling in tandem and taking evasive action when followed by police can give rise to reasonable suspicion), Jones, 44 F.3d at 872 (failure to stop in response to flashing police lights is factor supporting reasonable suspicion). We emphasize that reasonable suspicion does not amount to probable cause. "It requires considerably less than proof of wrongdoing by a preponderance of the evidence, but something more than an inchoate

and unparticularized suspicion or hunch." Melendez-Garcia, 28 F.3d at 1051 (internal quotation marks omitted).

We reject the district court's finding that Sergeant Reinhart behaved unreasonably in failing to confirm the physical description of the suspect with Officer Maschmeier. In determining whether police conduct during an investigatory stop is reasonable, a court "should take care to consider whether police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." Sharpe, 470 U.S. at 686. The two officers were confronting six suspects at 3:30 a.m. Sergeant Reinhart had confirmed that a suspect's name, birth date, sex and race matched that of an armed and dangerous felon under suspicious circumstances where the suspect did not have a driver's license or other adequate identification. We are unwilling to hold that he should have discussed the situation with Officer Maschmeier further before taking precautions for the officers' safety.

The defendants argue that the NCIC bulletin for Karlton Wilbur Smith could not provide reasonable suspicion to detain a different individual. We disagree. "A mistaken premise can furnish grounds for a Terry stop, if the officers do not know that it is mistaken and are reasonable in acting upon it." United States v. Ornelas-Ledesma, 16 F.3d 714, 718 (7th Cir. 1994), judgment vacated on other grounds, 116 S. Ct. 1657 (1996). In United States v. Lang, 81 F.3d 955 (10th Cir. 1996), federal agents were investigating a person suspected to be involved in armed robbery and murder. One agent

- 27 -

believed he saw the suspect enter a vehicle. The agents surrounded the vehicle, ordered the occupants out, and patted them down for weapons, discovering cocaine on the passenger. The only basis for the stop and the search was the agents' belief that their suspect was in the vehicle--a belief that, immediately after the search, the agents discovered was mistaken. Id. at 958-60. We upheld the district court's denial of defendants' motion to suppress, concluding: (1) the agents had a reasonable suspicion that their suspect was involved in the robberies and murder; (2) the agents' misidentification of defendant as their suspect was reasonable under the circumstances; and (3) it was reasonable, given the agents' legitimate belief that the defendant might be armed and dangerous, for the agents to conduct a pat down search to protect the agents' safety. Id. at 965-966. See also United States v. Walraven, 892 F.2d 972 (10th Cir. 1989) (deputy's stop of vehicle reasonable although based on dispatcher's mistaken transposition of two numbers on license plate; officer's failure to catch mistake was reasonable under circumstances and his understanding of situation provided reasonable suspicion).

The fact that the police reasonably suspected Smith of being armed and dangerous does not, of course, answer the question whether the display of firearms and use of handcuffs was reasonable as to the other five defendants. In Ybarra v. Illinois, 444 U.S. 85, 91 (1979), the Supreme Court cautioned that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." In Ybarra, police officers with a warrant to search a tavern

and its proprietor for drugs searched a customer as well. The Court invalidated the search of the customer, because the state did not articulate specific facts that would have justified suspicion of the customer. The Court noted that the lighting in the tavern was bright enough to allow the officers to observe that the customer's hands were empty and that he posed no threat to the officers' safety. Id. at 93. Ybarra is distinguishable. The officers in that case had no reason to believe that there was a connection between the customer and the proprietor other than the customer's presence in the bar. Here, the officers reasonably concluded that the defendants were traveling together. In Ybarra, the officers were looking for drugs. Here the police suspected that one of the defendants was armed and dangerous. The defendants' conduct in failing to produce licenses or to pull over when signaled by the police gave the officers individualized suspicion of the other defendants. Perhaps most important, the police confronted the defendants in their cars, at night. Unlike the officers in Ybarra, the officers here could not tell whether the defendants had weapons on their persons or within reach. Although the officers had not been informed that the other defendants were dangerous, we believe that in this case "a reasonably prudent man in the circumstances would be warranted in the belief that his safety . . . was in danger." Terry, 392 U.S. at 27. See also United States v. King, 990 F.2d 1552, 1561 (10th Cir. 1993) ("The governmental interest in the safety of police officers outweighs the individual's Fourth Amendment interest when an officer has an objective basis to believe the person . . . detained is armed and dangerous."); United

States v. Merritt, 695 F.2d 1263 (10th Cir. 1982) (knowledge that arms were found at suspect's residence and information that the suspect should be considered armed justifies suspicion that suspect and unidentified companions may be armed); United States v. Del Toro, 464 F.2d 520 (2d Cir. 1972) (approving protective frisk of unidentified companion of narcotics dealer); United States v. Tharpe, 536 F.2d 1098 (5th Cir. 1976) (approving frisk of passengers in car when driver is arrested and officers are aware of facts suggesting they are in danger), overruled in part on other grounds, United States v. Causey, 834 F.2d 1179 (5th Cir. 1987).

The reasonable belief that the defendants posed a danger justified the procedures in this case. The officers were entitled to display their weapons, to separate defendants from their vehicles, to conduct a pat down search, and to restrain the defendants with handcuffs until the officers had completed securing all the defendants. See Perdue, 8 F.3d at 1467 (ordering defendant to exit car and to lie on ground, displaying firearms, and using handcuffs did not transform Terry stop into arrest because measures were reasonable); King, 990 F.2d at 1557 (protective "frisk" within bounds of lawful Terry stop). For their own safety, the officers were entitled to remove the defendants one by one, which, because of the number of defendants, necessarily took time. We therefore conclude that "[a]lthough bordering on an illegal arrest, the precautionary measures of force employed by the officers were reasonable under the circumstances." Perdue, 8 F.3d at 1463.

3.      The subsequent detention and questioning of defendants

The felony Terry stop procedures were completed at approximately 4:45 a.m. At this point, the detention of the defendants was no longer related to the investigation of a routine traffic violation. Rather, the basis for this new Terry stop was the NCIC information that Smith might be an armed and dangerous felon, wanted on a weapons charge, and the officers' particularized suspicions of the other defendants. Having determined that this new stop was justified at its inception, we must now determine "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. Both the length of the detention and the degree of force employed must be reasonable.

After the defendants were removed from their cars, they were detained for approximately forty-five minutes, and then taken to the police station. We find that the length of the detention on the scene was reasonable. Between 4:45 a.m. and 5:15 a.m., the officers questioned several of the defendants in an attempt to discover their identities and whether they were authorized to drive the vehicles. See United States v. Medina, 992 F.2d 573 (6th Cir. 1993) (30 to 60 minute detention lawful while police were "questioning nine individuals who were at the scene" regarding drug activity), cert. denied, 510 U.S. 1109 (1994). Because the officers "diligently pursued a means of investigation," Sharpe, 470 U.S. at 686, detaining the defendants for this period of time did not, without more, violate the Fourth Amendment.

However, the degree of force used during this further roadside investigation raises further serious questions. With the exception of defendant Nash, all of the defendants remained handcuffed during this forty-five minute period. Mindful that an unreasonable level of force transforms a Terry detention into an arrest requiring probable cause, see Melendez-Garcia, 28 F.3d at 1052, we must examine whether the continued use of handcuffs was justified.

The officers had already frisked the defendants for weapons, and knew that none of them was armed. The officers had conducted "sweeps" of the passenger compartments of the vehicles, and had discovered no weapons. The officers on the scene, who did have weapons, outnumbered the defendants. The use of handcuffs was justified until all six defendants were secured, and for a reasonable time thereafter, while the officers conducted protective sweeps of the cars and assessed the situation. The officers were justified in keeping defendant Smith, who they still suspected was a wanted felon, in handcuffs, while they attempted to investigate his identity. It is not unreasonable to fear that a wanted felon will attempt to flee, and may jeopardize the safety of officers in such an attempt. The level of force, therefore, did not transform the legitimate detention of Smith into an arrest.

A more difficult question is presented by the continued use of handcuffs on defendants Shareef, Brown, Pitts, and Murphy, after the officers ascertained that none of the defendants was armed. Although finding it a close question, we hold that, at least

until 5:00 a.m. when the officers received confirmation that defendant Smith was not the individual wanted in the NCIC teletype, the use of handcuffs was reasonable. The number of suspects, the fact that the encounter took place at night, and the reasonable suspicion that one of the suspects was a wanted felon, justified the officers in keeping the defendants in handcuffs for the officers' safety. However, once the officers learned that Smith was not the individual identified in the NCIC teletype, the continued use of handcuffs constituted an unlawful arrest.

At approximately 5:00 a.m., Chief Davidson discovered that Smith's license was suspended and he was arrested. When the suspended license was discovered, the officers had probable cause to arrest Smith. See Kan. Stat. Ann. § 8-262(a)(1) ("Any person who drives a motor vehicle on any highway of this state at a time when such person's privilege to do so is canceled, suspended or revoked shall be guilty of a class B misdemeanor on the first conviction . . . ."). Since the discovery occurred approximately at the time or before the officers learned that Smith was not the individual in the teletype, we conclude that Smith was lawfully detained throughout the encounter, up to and including the point at which he was lawfully placed under arrest.

However, after approximately 5:00 a.m. there was no reasonable basis for keeping Shareef, Brown, Pitts and Murphy in handcuffs. Therefore, we must conclude that at that point their detention became an unlawful arrest. Melendez-Garcia, 28 F.3d at 1052. Nash was unlawfully arrested after she was transported from the scene of the stop to the

- 33 -

police station.  Transportation of a defendant to the police station can not be justified absent probable cause to believe the defendant committed a crime.  See United States v. Gonzalez, 763 F.2d 1127 (10th Cir. 1985) (police request that defendant follow them to station house not part of valid Terry stop);  Hayes v. Florida, 470 U.S. 811 (1985).

C.      The Suppression of the Evidence

We must next determine whether the suppressed evidence was the fruit of the unlawful detention of Shareef, Brown, Pitts, Murphy and Nash after about 5:00 a.m.  The Supreme Court has stated:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police.  Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

Wong Sun v. United States, 371 U.S. 471, 487-88 (1963) (internal quotation marks and citation omitted).  Of course, "if not even the 'but for' test can be met, then clearly the evidence is not a fruit of the prior Fourth Amendment violation."  5 Wayne LaFave, Search and Seizure:  A Treatise on the Fourth Amendment § 11.4(a), at 236-37.  We first examine the physical evidence found in the vehicles.

It is unclear when the officers received consent to search the vehicles.  However, because we find that the vehicles would have been impounded and searched as a result of a lawful investigation that was underway before any of the defendants was illegally seized, the exact timing is immaterial.  See Miller, 84 F.3d 1244 (refusing to suppress

drugs illegally seized from defendant's car because investigation already underway ultimately revealed car was stolen and drugs inevitably would have been discovered during inventory search); Eylicio-Montoya, 70 F.3d 1158 (10th Cir. 1995) (refusing to suppress drugs seized from defendant's car following unlawful arrest of defendant, as stop of defendant was lawful and drugs would inevitably have been discovered during stop); United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982) (refusing to suppress drugs seized illegally during pat-down of defendant, as police officers were about to have probable cause to arrest defendant independent of pat-down, and drugs inevitably would have been discovered during search incident to arrest). After the felony stop procedures were complete, the officers diligently pursued their investigation into the authority of the defendants to operate the vehicles. It was inevitable that the officers would request the rental agreements and discover that the defendants were not authorized to drive the vehicles. At no point did any defendant produce a valid license, registration or proof of legal entitlement to the vehicles. We have held that law enforcement officers may impound an automobile until the ownership of the vehicle can be ascertained. United States v. Long, 705 F.2d 1259, 1262 (10th Cir. 1983). Similarly, the police are not required to release a vehicle when there is no licensed driver to attend to it. See United States v. Harvey, 16 F.3d 109 (6th Cir.), cert. denied, 115 S. Ct. 258 (1994). The officers would not have allowed the vehicles to leave the scene while their investigation was ongoing. Because the seizure of the vehicles was not the fruit of the unlawful detention

of any of the defendants, the evidence found when those vehicles were searched was not "fruit of the poisonous tree." Accordingly, we REVERSE the portion of the district court order suppressing this physical evidence.

The statements made by the defendants are a different matter. After the felony stop procedures, all of the defendants were in police custody. Purdue, 8 F.3d at 1465 (felony stop procedures constitute custody for purpose of Miranda warnings). Several of the defendants were questioned by officers. Yet none of the defendants appears to have been given Miranda warnings. It is unclear which of the defendants' statements were made after they were unlawfully arrested. Although Smith was lawfully arrested, it similarly does not appear that he was given Miranda warnings at any point before being transported to the station. We therefore REMAND this case to the district court for a determination of what statements, if any, are excludable as fruit of an unlawful arrest or the failure to give Miranda warnings. We note that the government represented to us at oral argument that it would not take any further interlocutory appeals should the statements be suppressed, primarily because the government does not believe the statements are "substantial proof of a fact material to the proceeding." 18 U.S.C. § 3731.

## III.

The district court's order granting defendants' motion to suppress is REVERSED and REMANDED for further proceedings consistent with this opinion.

- 36 -