**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 6 1997**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JUAN FRANCISCO JASSO-
TREVINO,

    Defendant-Appellant.

No. 96-6251
(D.C. No. CR-96-37-M)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Paul Antonio Lacy, Assistant Federal Public Defender, Oklahoma City,
Oklahoma, for Plaintiff-Appellant.

Mark A. Yancey, Assistant United States Attorney (Patrick M. Ryan, United
States Attorney, with him on the brief), for Defendant-Appellee.

---

Before **BRORBY, HOLLOWAY** and **EBEL**, Circuit Judges.

---

    [*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

The Defendant in this criminal case, Mr. Juan Francisco Jasso-Trevino, appeals his conviction of the crime of being in the United States unlawfully after previously having been deported subsequent to a conviction for an aggravated felony, a violation of 8 U.S.C. § 1326(a) (1994). Mr. Jasso-Trevino argues the district court erred in denying his motion to suppress evidence obtained in violation of the Fourth Amendment. He requests we vacate his conviction, remand his case to the district court, and reverse the district court's denial of his motion to suppress. We instead affirm the district court.

## I. BACKGROUND

On February 23, 1996, at approximately 1:15 a.m., while monitoring traffic on Interstate 35, Oklahoma Highway Patrol Trooper Paul Hill observed a Buick station wagon twice swerve right and briefly straddle the outside lane line. Thinking the driver was either intoxicated or sleepy, Trooper Hill stopped the vehicle for improper lane usage, a violation of Okla. Stat. Ann. tit. 47, § 11-309 (West 1988).

Approaching the station wagon, Trooper Hill observed a male driver (Mr. Jasso-Trevino) and a male passenger (Mr. Jasso-Trevino's father, Mr. Francisco

Jasso-Amaro) in the front seat. He also noticed three white plastic bags and a small blue suitcase in the rear. Upon asking Mr. Jasso-Trevino for his driver's license, Trooper Hill learned he did not speak English but his father did.

Seeing no indications Mr. Jasso-Trevino was intoxicated, Trooper Hill assumed he was sleepy rather than intoxicated and decided to issue a warning for improper lane usage rather than a citation. With Mr. Jasso-Amaro interpreting, Trooper Hill obtained Mr. Jasso-Trevino's vehicle registration and Mexico driver's license. He asked Mr. Jasso-Amaro to accompany him back to the patrol car so he could explain why he was issuing a warning and inquire as to how long Mr. Jasso-Trevino had been driving.

Mr. Jasso-Amaro's responses to his questions raised Trooper Hill's suspicions. Mr. Jasso-Amaro said he and his son were returning home to Mexico after visiting relatives in Wisconsin for the past ten days. Trooper Hill thought this inconsistent with having only one small piece of luggage approximately 14" x 14." Trooper Hill became more suspicious when Mr. Jasso-Amaro was unable to state the addresses of the relatives they had been visiting or the city in Wisconsin where they had stayed.

Trooper Hill asked Mr. Jasso-Amaro if they were transporting any firearms, alcohol, tobacco, or narcotics, to which Mr. Jasso-Amaro responded "No." He then told Mr. Jasso-Amaro that after he issued the warning to Mr. Jasso-Trevino, he wanted Mr. Jasso-Amaro to translate, asking Mr. Jasso-Trevino if it would be alright to look in the vehicle for those items. They returned to the station wagon, where Trooper Hill issued the warning to Mr. Jasso-Trevino and returned his license and registration. Trooper Hill then requested Mr. Jasso-Amaro, who had opened the passenger door but was still standing, to explain the warning to Mr. Jasso-Trevino, tell him he was free to go, and ask if he minded one more question. Mr. Jasso-Amaro spoke in Spanish to his son, looked at Trooper Hill, and shook his head. Trooper Hill told Mr. Jasso-Amaro to ask Mr. Jasso-Trevino whether he was transporting any illegal firearms, alcohol, tobacco, or narcotics, at which time Mr. Jasso-Amaro again spoke in Spanish to Mr. Jasso-Trevino. Trooper Hill then told Mr. Jasso-Amaro to ask whether it would be okay if he searched the vehicle. Mr. Jasso-Amaro again spoke in Spanish to Mr. Jasso-Trevino, who responded by shaking his head and saying "Si."

Construing this as consent to a search, Trooper Hill ordered Mr. Jasso-Trevino and Mr. Jasso-Amaro to exit the station wagon and stand in front of his patrol car. He then, for safety reasons, called in other officers who monitored the

situation while he searched the station wagon with a drug-sniffing canine. The dog alerted twice on the outside driver's rear wheel well, as well as on an interior rear compartment located over that wheel well. Upon opening the compartment, Trooper Hill discovered marijuana seeds and residue. During the course of Trooper Hill's search, neither Mr. Jasso-Trevino nor Mr. Jasso-Amaro indicated a lack of consent to the search.

After finding the marijuana remnants, Trooper Hill, through his dispatcher, contacted the "EPIC" database in El Paso, Texas, to have background checks run on the detainees. The background check showed Mr. Jasso-Trevino had been convicted of trafficking in narcotics, was never to reenter the country and should be arrested for illegal reentry. Trooper Hill then arrested Mr. Jasso-Trevino for illegal reentry and detained Mr. Jasso-Amaro for marijuana possession. While patting them down, he found bundles of cash totaling $5,275 in Mr. Jasso-Trevino's pants and jacket, and $970 on Mr. Jasso-Amaro. Trooper Hill then had Mr. Jasso-Amaro read Mr. Jasso-Trevino his rights from a card stating a Spanish version of the *Miranda* warnings.

Trooper Hill transported Mr. Jasso-Trevino to the Oklahoma County Jail. Between 8:30 a.m. and 9:00 a.m., Immigration and Naturalization Service

officials removed Mr. Jasso-Trevino from jail and took him to their Oklahoma City office. There agents interviewed him after reading him his *Miranda* rights in Spanish. Mr. Jasso-Trevino admitted he had been deported from the United States for trafficking in narcotics and had illegally reentered the country.

Subsequently, a grand jury indicted Mr. Jasso-Trevino for violating 8 U.S.C. § 1326(a). After the district court's denial of his motion to suppress, he entered a conditional plea of guilty, preserving for appeal the issues raised in his motion to suppress. Those issues are now before us.

## II. ANALYSIS

Mr. Jasso-Trevino's assertions on appeal are threefold. He claims that although Trooper Hill's initial traffic stop may have been reasonable and justified, the trooper's subsequent actions were not reasonably related in scope to the circumstances justifying the original detention. He further contends Trooper Hill did not have valid consent to search the vehicle. Lastly, Mr. Jasso-Trevino argues his admission to the Immigration and Naturalization Service agents is inadmissible because it was given while he was illegally confined, as that confinement was the product of an unlawful detention, search and seizure.

The Fourth Amendment bars unreasonable searches and seizures. *United States v. Shareef*, 100 F.3d 1491, 1499 (10th Cir. 1996) (citing *Wilson v. Arkansas*, 115 S. Ct. 1914, 1916 (1995)). When reviewing the denial of a motion to suppress evidence allegedly obtained in violation of the Fourth Amendment, we accept the factual findings of the district court unless they are clearly erroneous. *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996). We are mindful the credibility of witnesses, the weight to be given evidence, and the inferences to be drawn therefrom are matters for the trial judge. *Id.*; *United States v. Fernandez*, 18 F.3d 874, 876 (10th Cir. 1994). However, the ultimate determination of whether a search was reasonable under the Fourth Amendment is a question of law subject to *de novo* review. *Hernandez*, 93 F.3d at 1498.

"A traffic stop is a seizure within the meaning of the Fourth Amendment." *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995), *cert. denied*, 116 S. Ct. 2529 (1996). However, ordinary traffic stops are more analogous to investigative detentions than custodial arrests. *Shareef*, 100 F.3d at 1500. Accordingly, we analyze such stops under the principles stated in *Terry v. Ohio*, 392 U.S. 1 (1968). *Shareef*, 100 F.3d at 1500. Under *Terry*, to determine the reasonableness of an investigative detention, we apply a two-pronged analysis, examining first "whether the officer's action was justified at its inception," and

second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20.

Mr. Jasso-Trevino does not contest the validity of the initial stop;[1] rather, he focuses on the second *Terry* inquiry, asserting the scope of the detention was excessive and not reasonably related to the justification for the original stop. The Supreme Court has informed us that although the permissible scope of an investigatory detention depends on "the particular facts and circumstances of each case," it must in any case "last no longer than is necessary to effectuate the purpose of the stop" and "be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Thus,

> "[a]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning."

*Fernandez*, 18 F.3d at 878 (quoting *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988)). However, if the officer "has an objectively reasonable

---

[1] His restraint is wise, for "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation." *Botero-Ospina*, 71 F.3d at 787. It is undisputed Mr. Jasso-Trevino violated Oklahoma law by improperly swerving out of his traffic lane.

and articulable suspicion that illegal activity has occurred or is occurring," or if the driver consents, the officer can further detain the driver for additional questioning unrelated to the original stop. *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir.), *cert. denied*, 511 U.S. 1095 (1994). In determining whether the officer could have formed a reasonable and articulable suspicion of criminal activity, we consider "the totality of the circumstances," *Fernandez*, 18 F.3d at 878, including "the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions," *United States v. Martinez-Cigarroa*, 44 F.3d 908, 912 (10th Cir.) (Baldock, J., concurring), *cert. denied*, 115 S. Ct. 1386 (1995), though "[a]n officer's 'inchoate and unparticularized suspicion or "hunch"' is insufficient to give rise to reasonable suspicion." *Fernandez*, 18 F.3d at 878 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

Here, while still engaged in a legitimate traffic stop, Trooper Hill acquired an "objectively reasonable and articulable suspicion" Mr. Jasso-Trevino was participating in illegal activity. Initially, Mr. Jasso-Amaro's claim he and his son were returning from a ten-day vacation did not square with Trooper Hill's observation the station wagon contained insufficient luggage for that period of time, indicating something was amiss. *See United States v. Arango*, 912 F.2d

441, 447 (10th Cir. 1990) (inadequate amount of luggage for alleged two-week vacation, combined with driver's inability to provide credible proof of vehicle ownership, provided reasonable suspicion of illegal activity), *cert. denied*, 499 U.S. 924 (1991). Upon further questioning, Mr. Jasso-Amaro was unable to provide the addresses of the relatives he claimed he and his son had been visiting, or even name the city in which they had allegedly spent the past ten days. *See United States v. Kopp*, 45 F.3d 1450, 1453-54 (10th Cir.), *cert. denied*, 115 S. Ct. 1721 (1995) (looking to incomplete or implausible description of travel plans as indicia of reasonable suspicion); *United States v. Soto*, 988 F.2d 1548, 1554, 1556 (10th Cir. 1993) (finding reasonable suspicion where driver appeared "panicky" and was unable to provide even a general address for the uncle who allegedly loaned him the car he was driving). The district court, after noting Trooper Hill to be a "very credible witness," found these objective facts gave Trooper Hill justification to further detain Mr. Jasso-Trevino and Mr. Jasso-Amaro. We agree that these facts, taken together, justified Trooper Hill in detaining Mr. Jasso-Trevino beyond the scope of the initial stop.

Mr. Jasso-Trevino next asserts Trooper Hill did not have valid consent to search the vehicle, and therefore the search violated his rights under the Fourth Amendment. Voluntary consent to further questioning or a search may convert a

traffic stop to a consensual encounter. *See Hernandez*, 93 F.3d at 1498. If an individual is free to leave at any time, he or she is not seized within the meaning of the Fourth Amendment. *Id.* Thus, the existence of reasonable suspicion or probable cause is irrelevant if the driver of a vehicle voluntarily consents to its search. *See United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995). Voluntariness is a question of fact to be determined by examining the totality of the circumstances. *Ohio v. Robinette*, 117 S. Ct. 417, 421 (1996). The burden of proof is on the government to provide "'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given,'" and that "consent was given without implied or express duress or coercion." *Angulo-Fernandez*, 53 F.3d at 1180 (quoting *United States v. Dewitt*, 946 F.2d 1497, 1500 (10th Cir.1991), *cert. denied*, 502 U.S. 1118 (1992)).[2]

Here, we cannot say the district court's finding Mr. Jasso-Trevino voluntarily consented to the search was clearly erroneous. Trooper Hill returned Mr. Jasso-Trevino's license and registration to him and, through his father, informed him he was free to go. He then asked Mr. Jasso-Amaro to ask Mr. Jasso-Trevino whether it would be okay to search the vehicle, and Mr. Jasso-

---

[2] Because we find the detention lawful, the government need not satisfy the heavier burden, urged by Mr. Jasso-Trevino, applicable when consent is given after an illegal stop. *See, e.g.*, *Fernandez*, 18 F.3d at 881.

Trevino testified he responded "Yes, okay." Though Trooper Hill did not inform Mr. Jasso-Trevino he had the right to refuse consent, such a statement is not necessary for consent to be valid. *See United States v. Flores*, 48 F.3d 467, 469 (10th Cir.), *cert. denied*, 116 S. Ct. 122 (1995). Notably, Trooper Hill took no action to intimidate or coerce Mr. Jasso-Trevino: he never threatened Mr. Jasso-Trevino; he never drew his gun; he did not touch Mr. Jasso-Trevino until the time of the arrest; there is no indication in the record that he used an intimidating or coercive tone of voice; and the backup troopers were approximately fifteen to twenty feet away. *See Flores*, 48 F.3d at 469 (lack of intimidation or coercion significant to finding consent voluntary); *Soto*, 988 F.2d at 1558 (same). Moreover, through the course of Trooper Hill's search, Mr. Jasso-Trevino did nothing to indicate a lack of consent; rather, he simply stood idly by. This too weighs in favor of finding his consent to have been voluntary. *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990) (citing *United States v. Espinosa*, 782 F.2d 888, 890-92 (10th Cir. 1986); *United States v. Lopez*, 777 F.2d 543, 546-48 (10th Cir.1985)).

Because we find no unlawful detention, search or seizure, Mr. Jasso-Trevino's argument his statements to Immigration and Naturalization Services agents are inadmissible "fruit of the poisonous tree" must fail.

**AFFIRMED.**

**Entered for the Court**

**WADE BRORBY**
United States Circuit Judge