**UNITED STATES of America, Plaintiff,**

v.

**Isidro MONDRAGON FARIAS and Artemio Mondragon Farias, Defendants.**

**No. 2:98–CR–0481–S.**

United States District Court, D.Utah, Central Division.

March 16, 1999.

Leshia M. Lee–Dixon, Asst. U.S. Atty., Salt Lake City, UT, for plaintiff.

Benjamin A. Hamilton, Salt Lake City, UT, Robert L. Booker, Booker & Associates, Salt Lake City, UT, for defendants.

## MEMORANDUM DECISION

SAM, Chief Judge.

Before the court are two motions to suppress evidence filed by defendants Isidro Mondragon Farias and Artemio Mondragon Farias. On December 14, 1998, the court conducted an evidentiary hearing to address defendants' motions. Present were Benjamin A. Hamilton, Esq., representing defendant Isidro Mondragon Farias; Robert L. Booker, Esq. and Christopher T. Beck, Esq., representing defendant Artemio Mondragon Farias; and Leshia M. Lee–Dixon, Esq., Assistant United States Attorney, representing the government. At the conclusion of the hearing, the court set forth a schedule for supplemental briefing to be filed by counsel, based upon the evidence presented. All briefing is now complete, and the court, having reviewed and carefully considered counsels' memoranda and the evidence presented at the hearing, is prepared to render the following ruling.

## I. FINDINGS OF FACT

On September 4, 1998, Sergeant Paul V. Mangelson of the Utah Highway Patrol ("Mangelson") observed a gray pickup truck traveling north on Interstate 15 near Nephi, Utah. Prior to Mangelson beginning his shift, he determined that his radar equipment and video camera, both installed in his patrol car, were functioning properly. Mangelson clocked the truck's speed at 82 miles per hour which was 7 miles over the posted speed limit of 75 miles per hour. Mangelson then activated his overhead lights, which switched the video camera on, and stopped the truck. Mangelson's encounter with defendants was, thus, recorded on a video tape which has been admitted into evidence. Defendant Artemio Mondragon Farias ("Artemio") was driving, and his brother, defendant Isidro Mondragon Farias ("Isidro"), was the only passenger.

Mangelson testified that, upon approaching the truck, which had California license plates, he could see and smell air fresheners and saw no luggage other than a black duffle bag. He also saw a road atlas and fast food containers. When Mangelson began asking questions in English, he noticed that, although able to answer some questions, the occupants of the truck were not fluent in English.

Mangelson began by asking for Artemio's driver's license. Artemio apparently produced both his license and the vehicle registration information. When Mangelson asked Artemio who owned the truck, Artemio responded that it was his brother's truck. Mangelson then inquired where Artemio's brother was, and Artemio replied "Alfredo Mondragon". Then, apparently with assistance from Isidro, Artemio replied "in Santa Ana".

Mangelson asked where they were traveling, and Artemio responded that they were going to Iowa where his sister lives. Mangelson inquired if Isidro was Artemio's father, and Artemio replied that they were friends. Mangelson then asked

about the speedometer, but Artemio said he did not understand.

Mangelson apparently took the vehicle registration with him as he viewed the front license plate. He then returned to the driver's window and asked Artemio for the name of his brother who owned the truck. Artemio told him the name was Alfredo Mondragon. The name on the registration was Alfredo Mondragon. At the hearing, Mangelson testified that, at that point, he had no objective evidence that Artemio was lying about the ownership of the truck. At that time, Mangelson did not issue Artemio a speeding citation nor did he check the computer to determine defendants' criminal history, whether the vehicle was stolen, or whether the documents produced by defendants were valid. Mangelson then asked Artemio where Alfredo lived. Artemio initially responded "Farias", giving his last name, but, with help from Isidro, then answered "Santa Ana". When Mangelson stated that Santa Ana did not match the registration information, the two defendants stated "Tustin? Yeah, Tustin."

Mangelson then asked Isidro if he had any identification, and Isidro produced an identification card containing the name of Carlos Gonzalez Gomez. Mangelson testified at the hearing that the card Isidro gave him appeared valid.

Mangelson next inquired as to the name of the sister who lived in Iowa. Both defendants responded that her name was Alicia. After Mangelson asked defendants several times for the place where Alicia lived in Iowa, Isidro stated she lived in Wapello. He said he also lived in Wapello.

Mangelson then attempted many times to ask how the two defendants came to be coming from California. Apparently not understanding Mangelson's questions, Isidro stated, at various times, that he was now living in Iowa, and his brother and two sisters lived in California. Isidro then said he was in California for two weeks' vacation. Mangelson testified that, on several occasions, there was a breakdown in communication because of the language barrier.

Mangelson testified that, based on the information given to him by defendants, he had several concerns. He stated he was "concerned somewhat about ownership of the vehicle." He was "also concerned about the fact that these guys could possibly be smugglers of narcotics." (Hearing Transcript, p. 16). Further, Mangelson was suspicious about defendants' story of going to see a sister in Iowa as well as the presence of air fresheners, a road atlas, and fast food wrappers in the truck.

Mangelson next asked, "There's nothing illegal in the truck is there?" After receiving no response, Mangelson repeated, "Nothing illegal?" He then asked if there were drugs or weapons in the car, and defendants responded negatively. While still in possession of the vehicle registration, the driver's license, and the identification card, Mangelson next inquired, "Can I search?" At first, Artemio seemed to respond affirmatively. Mangelson again asked, "You don't mind if I search the truck?" Defendants gave no response audible or visible on the video tape to Mangelson's second request to search.

Mangelson then stated, "Why don't you step out?" After defendants exited the truck, Mangelson performed a pat-down search on each of them which revealed nothing illegal. He returned defendants' documents to Artemio. He then told defendants to stand away from the vehicle and began to search.

Mangelson's search of the luggage in the truck bed, apparently belonging to Artemio, and the truck's passenger area revealed no controlled substances. In the passenger area, Mangelson found air fresheners, a tool box, a "wedge type device that is used to hold the battery down" (Hearing Transcript, pages 25–26), and a piece of rubber floor mat.

Mangelson then opened the truck's hood and discovered what he believed to be an altered battery. Isidro obtained a screw-

driver from inside the truck and assisted Mangelson in opening the battery. Mangelson grew suspicious when, after partially dismantling the battery and sticking the screwdriver into the water, he hit something solid. Mangelson then requested Isidro to follow him as he drove back to the police station and asked Artemio to ride in the patrol car with him. En route to the station, Mangelson contacted dispatch to inquire about defendants' criminal history.

At the police station, defendants were placed in a holding cell. Mangelson then asked them if there were drugs in the battery. Defendants responded that there were not. After using tools to dismantle the battery, Mangelson discovered a quantity of methamphetamine inside the battery. When drugs were discovered, defendants were brought from the holding cell, handcuffed together. When Mangelson showed the battery and its contents to defendants, Isidro made some statements about where the battery had been purchased. Mangelson then read defendants their *Miranda* rights in English. When Mangelson noticed defendants did not appear to understand, he gave defendants a card explaining their *Miranda* rights in Spanish and had defendants read it to themselves. Subsequently, Isidro stated, in Spanish, "yeah, a lawyer" and, in English, "no money". He then repeated, "yeah, a lawyer". Mangelson then proceeded to question Isidro concerning what Mangelson had found.

## II. ANALYSIS

The parties have raised several issues in their briefing the court will address below.

### A. *Legality of the Traffic Stop*

At the outset, the government contends Mangelson's stop of defendants' vehicle was lawful as it was based on Mangelson's observation, as well as the confirmation of his radar equipment, that the speed of defendants' vehicle was faster than the posted speed limit. *See Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v.*

*Shareef,* 100 F.3d 1491, 1500 (10th Cir. 1996); *United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir.1995) (en banc), *cert. denied,* 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996). As neither defendant challenges the legitimacy of the traffic stop, and the evidence supports the government's position, the court concludes Mangelson's initial stop for speeding was proper.

### B. *Defendants' Standing to Contest Detention and Search of the Vehicle*

#### 1. Detention

■ Both defendants challenge the validity of their continued detention by Mangelson after the initial traffic stop. Because an objection to detention is personal to each individual, the court concludes both defendants have standing to raise this issue. *See United States v. Gama–Bastidas,* 142 F.3d 1233, 1239 (10th Cir.1998); *United States v. Eylicio–Montoya,* 70 F.3d 1158, 1164 (10th Cir.1995).

#### 2. Search

■ Both defendants also challenge the search of the vehicle in which they were traveling. Suppression of evidence seized during a search is warranted when the court determines the search has violated the defendants' Fourth Amendment rights. To make that determination, this court must evaluate two factors: "'(1) whether the defendant has manifested a subjective expectation of privacy in the object of the challenged search, and (2) whether that expectation of privacy was objectively reasonable." *Gama–Bastidas,* 142 F.3d at 1238–39; *accord Eylicio–Montoya,* 70 F.3d at 1162. The court is of the opinion that the positions of the two defendants must be evaluated differently from each other with regard to the search of the truck.

■ Artemio was driving. The evidence indicates that, in response to Mangelson's requests, Artemio produced a driver's license and vehicle registration information and told Mangelson, at least

twice, that the truck belonged to his brother, Alfredo Mondragon. The driver's license was in the name of Artemio Mondragon Farias. The vehicle registration information indicated the vehicle was owned by Alfredo Mondragon. Artemio represented that he and the vehicle's owner were brothers and produced a driver's license and a vehicle registration listing individuals with the same last name. During the evidentiary hearing, Mangelson testified that, at this point, the license and registration appeared to be valid, he had no objective evidence that Artemio was lying about the ownership of the truck, and he did not check to determine if the vehicle was stolen. The court concludes Artemio has standing to object to the search of the vehicle as he demonstrated a reasonable expectation of privacy in the truck. *See, e.g., United States v. Rubio–Rivera*, 917 F.2d 1271, 1275 (10th Cir. 1990) ("Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle."); *United States v. Arango*, 912 F.2d 441, 445 (10th Cir.1990) ("Although we recognize that the proponent of a motion to suppress need not always come forward with legal documentation establishing that he lawfully possessed the area searched, ... the proponent must at least state that he gained possession from the owner or someone with the authority to grant possession."), *cert. denied*, 499 U.S. 924, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991).

■■■ Isidro was a passenger in the truck Artemio was driving. Generally, "a passenger who asserts neither a possessory nor a property interest in a vehicle would not normally have a legitimate expectation of privacy in the vehicle." *Gama–Bastidas*, 142 F.3d at 1239; *accord Eylicio–Montoya*, 70 F.3d at 1162. A defendant, however, "may establish a reasonable expectation of privacy by presenting evidence of some lawful control or possession of the vehicle." *Gama–Bastidas*, 142

F.3d at 1239. The evidence indicates that, in response to Mangelson's request for identification, Isidro produced an identification card with the name of Carlos Gonzalez Gomez. At the hearing, Mangelson testified the card appeared valid. Moreover, when Mangelson inquired if Isidro was Artemio's father, defendants represented that they were friends. Isidro, thus, never established he was an authorized driver of the vehicle or that he had any privacy interest in or control over the truck or its contents. The court, therefore, concludes Isidro has not shown any legitimate possessory interest in or control over the vehicle and lacks standing to contest a search thereof. *See, e.g., Eylicio–Montoya*, 70 F.3d at 1162 (even the fact that passenger had owner's permission to ride in searched vehicle was inadequate to establish passenger's legitimate expectation of privacy in vehicle).

## C. Detention

■■■ Mangelson stopped defendants' vehicle for violating the speed limit. It is undisputed that "[a] routine traffic stop is a seizure within the meaning of the Fourth Amendment." *Shareef*, 100 F.3d at 1500; *accord Gama–Bastidas*, 142 F.3d at 1239. "'[I]nvestigative detentions ... are Fourth Amendment seizures of limited scope and duration [which] must be supported by a reasonable suspicion of criminal activity.'" *Shareef*, 100 F.3d at 1500 (quoting *United States v. Davis*, 94 F.3d 1465, 1467–68 (10th Cir.1996)). The Tenth Circuit has recognized that, because a traffic stop is similar to an investigative detention, the scope of that stop should be examined under the standards in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See id.* In determining whether an investigative detention is reasonable under the Fourth Amendment, the court must consider "'whether the officer's action was justified at its inception,'" and "'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry*, 392 U.S. at 20, 88 S.Ct.

1868). In this case, it is undisputed that Mangelson's initial stop was valid. Thus, the court must focus upon whether Mangelson's subsequent detention of defendants was reasonably related in scope to his traffic stop for speeding.

The Tenth Circuit has stated:

"[a]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning."

*Id.* at 1501 (quoting *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.), *cert. denied,* 511 U.S. 1095, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994)). In the instant case, defendants produced a driver's license, vehicle registration information, and an identification card, all of which appeared valid at the time, in response to Mangelson's requests. Artemio identified the vehicle's owner, Alfredo Mondragon, as his brother, and the name Mondragon appeared on both the driver's license and the vehicle registration. At that point, however, Mangelson did not issue a speeding citation or run a computer check to determine defendants' criminal history or whether the documents defendants produced were valid. Moreover, although Mangelson later testified at the hearing that he was "concerned somewhat about ownership of the vehicle," he did not investigate whether the vehicle was stolen at that time. Instead, Mangelson, while still in possession of the driver's license, the vehicle registration, and the identification card, continued to detain defendants in order to ask questions unrelated to the purpose of his initial stop. *See, e.g., United States v. Lambert,* 46 F.3d 1064, 1068 (10th Cir.1995) ("Precedent clearly establishes that when law enforcement officials retain an individual's driver's license in the course of questioning him, that individual, as a general rule, will not reasonably feel free to terminate the encounter."); *United States v. Walker,* 933 F.2d 812, 817 (10th Cir.1991) (encounter was "clearly not consensual" and the defendant was not free to leave where officer "retained the defendant's driver's license and registration during the entire time he questioned the defendant"), *cert. denied,* 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). Mangelson asked the name of the sister who lived in Iowa and where, specifically, in Iowa she lived. He then inquired as to how defendants came to be traveling from California. Mangelson next asked if there was anything illegal in the truck and if defendants had any drugs or weapons. Finally, Mangelson asked if he could search the truck. The court, thus, concludes Mangelson detained defendants longer than was necessary to issue a speeding citation. Because Mangelson then asked questions unrelated in scope to the circumstances which justified his initial stop, the court concludes the detention constituted an unreasonable seizure pursuant to the Fourth Amendment. *See Walker,* 933 F.2d at 815–16.

■ The United States contends, however, that Mangelson's detention of defendants and request for permission to search the truck were justified by a reasonable suspicion of criminal activity. "In determining whether reasonable suspicion exists, the totality of the circumstances-the whole picture-must be taken into account. Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Lambert,* 46 F.3d at 1069 (citations omitted). In the instant case, Mangelson's basis for detaining defendants and suspecting them of involvement in criminal activity was his observation of a road atlas, fast food wrappers, and little luggage in the vehicle. Mangelson was also suspicious of defendants' statements that they were traveling to Iowa where Artemio's sister lived. Finally, Mangelson could see and smell air fresheners in defendants' truck. The court must, therefore, closely examine these factors.

In *United States v. Wood*, 106 F.3d 942 (10th Cir.1997), the Tenth Circuit addressed the presence of maps and fast food containers in vehicles, stating:

> The presence of open maps in the passenger compartment is not only consistent with [defendant's] explanation [of cross-country travel], but is entirely consistent with innocent travel such that, in the absence of contradictory information, it cannot reasonably be said to give rise to suspicion of criminal activity.... Remnants from fast-food restaurants can probably be found on the floor of many cars traveling the interstate highways.... The possession of open maps and the vestiges of fast-food meals describes a very large category of presumably innocent travelers ... and any suspicion associated with these items is virtually nonexistent.

*Id.* at 947. The presence of a road atlas and fast food wrappers in defendants' vehicle is consistent with their explanation of traveling to Iowa. Based upon *Wood*, the court is persuaded that these items do not offer a particularized and objective basis for suspecting defendants of criminal activity.

At the hearing, Mangelson stated he noticed very little luggage in defendants' vehicle. There was one big, black duffle bag in the bed of the truck which is visible on the video tape of the stop. Because Mangelson never questioned defendants in any way about their luggage [1] or explained why he thought the luggage was suspicious, either at the time of the traffic stop or during the hearing, however, the court has no basis to conclude that the duffle bag is a factor supporting possible criminal activity by defendants.

Next, Mangelson indicated he was concerned about defendants' story that they were traveling to Iowa. The evidence indicates that, despite problems in understanding Mangelson's questions about their travel plans, defendants explained they were going to Iowa where Artemio's sister lives. When Mangelson later asked the name of the sister in Iowa and, with great difficulty in communication, where in Iowa the sister lived, defendants responded that her name was Alicia, and she lived in Wapello. The court finds nothing unusual about defendants' responses to Mangelson's questions or about the explanation of their travel to Iowa. During the hearing, Mangelson noted that, through his access to police information, he believed Iowa to be a place known for its drug activity. This factor, alone, however does not transform an explanation otherwise consistent with innocent, lawful travel plans into activity triggering reasonable suspicion of criminal behavior.

Finally, Mangelson stated he smelled the odor of air fresheners and saw them inside defendants' truck although, during the evidentiary hearing, there was some dispute about their quantity and location. The Tenth Circuit has also addressed the presence of air fresheners in vehicles. A concurring opinion in *United States v. Alvarez*, 68 F.3d 1242 (10th Cir.1995), *cert. denied*, 517 U.S. 1143, 116 S.Ct. 1436, 134 L.Ed.2d 557 (1996), noted that "[s]tanding alone, air freshener is not sufficient to justify a reasonable search for drugs. However, we have repeatedly held that air freshener coupled with other indicia of criminal activity supports a reasonable brief inquiry for purposes of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." *Id.* at 1245–46. This court is of the opinion that the presence of several air fresheners in defendants' truck provides the strongest support for Mangelson's suspicion of criminal activity. Even that support is neutralized somewhat, however, because, in this case, there is no indication that the air fresheners were masking the odor of drugs. Rather, Mangelson ultimately discovered the drugs in the vehi-

---

1. The court notes that, at one point during Mangelson's questioning of defendants, as revealed on the video tape, it appears Isidro states he had been in California for two weeks' vacation. Mangelson never acknowledged or pursued this response and never asked defendants about their luggage at all.

cle's battery and never testified he smelled an odor of drugs even when he dismantled the battery. Because the other factors discussed above are not indicia of criminal activity, the court concludes the air freshener alone is an insufficient basis for the continued detention of defendants.

After examining the totality of the circumstances, the court finds insufficient evidence to establish a reasonable suspicion of criminal activity to justify the continued detention of defendants. Rather, it appears Mangelson's detention of defendants was based upon merely a "hunch" that criminal activity was afoot. *See United States v. Fernandez,* 18 F.3d 874, 878 (10th Cir.1994) ("An officer's inchoate and unparticularized suspicion or hunch is insufficient to give rise to reasonable suspicion."). Thus, because Mangelson had no particularized and objective basis supporting any suspicions he may have had, his continued detention of defendants violated the Fourth Amendment.

As noted above, both defendants have standing to contest their detention by Mangelson. *See, e.g., Eylicio–Montoya,* 70 F.3d at 1164 (Even "a passenger has standing to challenge a constitutionally improper ... detention ... on Fourth Amendment grounds even though, when the seizure occurs, [he] has no possessory or ownership interest in either the vehicle in which [he] is riding or in its contents."). Moreover, if defendants' detention was unlawful, any evidence obtained as a result of that unlawful detention must be suppressed as fruit of the poisonous tree. *See Arango,* 912 F.2d at 446. The court has determined that Mangelson's detention of defendants was illegal. Therefore, the evidence obtained, including the drugs discovered in the battery, must be suppressed if it is the fruit of the illegality.

The government contends, however, that defendants voluntarily consented to Mangelson's search of the vehicle which ultimately led to the discovery of drugs. The Tenth Circuit has recognized that additional questioning by an officer during a traffic stop is acceptable in two situations only.

Either the officer must have "an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring" or "the initial detention has become a consensual encounter." *See United States v. Mendez,* 118 F.3d 1426, 1429–30 (10th Cir.1997); *United States v. McRae,* 81 F.3d 1528, 1534 (10th Cir.1996). As the court has established that the circumstances of this case do not fall under the first example, it will address the second.

### D. Consent to Search the Vehicle

In determining whether Mangelson and defendants were involved in a consensual encounter, the court must focus upon "the totality of the circumstances" in this specific case. *Mendez,* 118 F.3d at 1430. The Tenth Circuit has held that " 'an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him.' " *United States v. Gregory,* 79 F.3d 973, 979 (10th Cir.1996) (quoting *Gonzalez–Lerma,* 14 F.3d at 1483) A review of the video tape confirms that Mangelson retained the driver's license, vehicle registration information, and the identification card produced by defendants until after he had requested permission to search and had defendants step out of the truck. Thus, the court concludes the encounter between Mangelson and defendants was never a consensual one.

Additionally, the court is of the opinion that a number of factors preclude a finding that defendants voluntarily consented to a search of the truck. *See Gregory,* 79 F.3d at 979 ("[W]hile returning a driver's documents is necessary to show that the police-citizen encounter was consensual, it may not always be sufficient."). The Tenth Circuit has set forth a two-prong test to apply when considering the voluntariness of a consent. "First, the government must proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given. Furthermore, the government must prove that this consent was given

without implied or express duress or coercion." *McRae*, 81 F.3d at 1537 (citations omitted).

 Artemio, who has standing to challenge the search, initially claims that, due to communication problems because of the differences in language, he never voluntarily consented to a search. "Language barriers are relevant in evaluating the [defendant's] ability to act knowingly, intelligently, and voluntarily." *United States v. Hernandez*, 893 F.Supp. 952, 961 (D.Kan.1995), *aff'd*, 103 F.3d 145 (10th Cir. 1996). During the hearing, Mangelson agreed that there were at least six or seven times when communication with defendants broke down. The video tape reveals several instances in which Artemio gave non-responsive answers to Mangelson's questions. For example, when Mangelson asked Artemio where his brother was, Artemio's first response was "Alfredo Mondragon". When Mangelson asked Artemio about the reading on the speedometer, Artemio · said, "I don't understand." When Mangelson asked Artemio where his brother Alfredo lived, Artemio responded, "Farias", giving his last name. Mangelson then made several attempts to elicit the name of the sister in Iowa and to learn how defendants came to be traveling from California, obtaining this information, it appears, with great difficulty. Ultimately, Mangelson requested permission to search. A close examination of the video tape reveals that Artemio said something like "yeah." However, when Mangelson again asked to search, he gave no response. After a careful review of the evidence, the court cannot conclude that any consent given by Artemio was clear, positive, unequivocal, specific, or freely and intelligently given. Accordingly, the government has not met its burden in proving voluntary consent.

Furthermore, there is no evidence that Mangelson ever informed defendants they were free to leave the scene at any time after he stopped them. *See Gregory*, 79 ·F.3d at 979. Indeed, as noted above, the fact that Mangelson retained their documents during his questioning would lead defendants to reach the opposite conclusion. *See Lambert*, 46 F.3d at 1068; *Walker*, 933 F.2d at 817. Finally, there is no evidence that Mangelson ever informed defendants they could refuse to grant him permission to search the truck. *See Gregory*, 79 F.3d at 979; *United States v. McSwain*, 29 F.3d 558, 563 (10th Cir.1994) (failing to inform defendant "that he was free to leave the scene or that he could refuse to give his consent" are "important factors").

### E. *Violation of Miranda Rights*

 Isidro argues his rights pursuant to *Miranda* were violated while at the police station. He claims any statements he made after Mangelson showed him the battery and its contents but before he was informed of his rights are inadmissible. Furthermore, Isidro contends that his rights were violated again when Mangelson proceeded to question him after Isidro had read his rights in Spanish and had requested a lawyer. The court concludes any statements Isidro made prior to receiving his *Miranda* rights, during his illegal detention, are fruit of the poisonous tree. Moreover, the government concedes Isidro's *Miranda* rights were violated when Mangelson continued to question him after he had requested a lawyer and stated he had no money.

### III. CONCLUSION

Based on the analysis outlined above, the court finds that Mangelson's initial traffic stop, based on defendants' speeding, was valid. However, Mangelson unlawfully detained defendants, in the absence of a reasonable suspicion of criminal activity, and he performed a search without defendants' voluntary consent. Moreover, he continued to question defendant Isidro Mondragon Farias after he had been informed of his *Miranda* rights and had requested a lawyer. The court, thus, concludes all statements and evidence, including the drugs Mangelson discovered in the

truck's battery, are the fruit of the prior illegality and must be suppressed. Accordingly, defendants' motions to suppress are hereby GRANTED.