ORME, Judge
(concurring in part and concurring in the result):
¶82 I readily concur in the judgment ultimately reached by my colleagues, that Martinez-Castellanos is entitled to “a new trial with different counsel” and an impartial jury. And I concur in much of what is said in the lead opinion. But the path I take to thé correct result is much more direct and much less guarded than that preferred by my colleagues. When our ordinary presumptions and deferential approach are set to one side, as they should be in this extraordinary case, it is clear that a serious miscarriage of justice occurred here. And notions of judicial restraint and deference should not keep us from saying so.
¶83 I have three main areas of disagreement with the lead opinion. The first one is fairly basic. As explained in the lead opinion, no record was made of the interviews conducted in chambers with several of the prospective jurors. Had that gap remained, it would be appropriate to presume the regularity of the proceedings of which there was no record and indulge the presumption that appropriate questions were asked of the jurors and proper objections raised, discussed, and ruled upon. But there is no occasion to employ that fiction here. We have a record of the in-chambers proceedings, albeit one that was reconstructed in accordance with rule 11(h) of the Utah Rules of Appellate Procedure rather than a verbatim one made via court reporter or a recording.[12] By the express terms of that rule, the record of that proceeding, as reconstructed by the parties on appeal, “conform[s] to the truth,” and we should treat it like any other part of the record. Utah R. App. P. 11(h). Accordingly, the fact that the supplemental record does not reveal incisive follow-up questions does not mean that they might have been asked; it means that they were not. Likewise, the fact that the reconstructed record includes no hint of challenges for cause does not mean that they might have been made; it means that they were not.
*456 ¶84 Thus, I do not share my colleagues’ mystification about what happened in chambers. For purposes of this appeal, we know what happened in chambers. Contrary to the tack taken in paragraphs 12 and 13 of the lead opinion, it is clear from our record, reconstructed to conform to the truth though it may be, that no “specific concerns were raised about any particular venire member” and that none “were actually challenged for cause. Astonishingly, this is true even with respect to Juror One—more about him later—a retired veteran of the Utah Highway Patrol who knew the arresting trooper in this case and who had himself made many—very many—traffic stops and drug arrests like the one involved in this case, along the same stretch of highway in the same county.”
¶85 Second, this is not a case for application of the usual presumption that defense counsel performed diligently and that any decisions made in the course of preparation and trial were a function of competent performance and sound tactics on his part. Counsel’s failure to meet his briefing obligations and otherwise pursue the motion to suppress, especially with the many extensions and opportunities he was given, is inexcusable.[13] His failure to include his client in the jury selection process in any meaningful way is likewise inexcusable, but his failure to at least let his client know that Juror One, destined to become the jury foreperson, was a longtime veteran of the Highway Patrol who had made it his life’s mission to catch drug runners in Juab County was nothing short of unprofessional. And counsel’s explanation that he was anxious to have Juror One remain on the jury because he figured that, with Juror One’s extensive background in making similar stops, he would know this one was illegal, is ridiculous, as is more fully explained below.
¶86 My third concern focuses on Juror One, who is none other than the legendary Sergeant Paul Mangelson. It is impossible to understand the magnitude of the problem with his selection as a juror in this case without knowing his identity. The parties on appeal recognize this, and in their briefs, which are matters of public record, they freely disclose his identity as they debate the propriety of his serving on the jury, And no effort was made in the proceedings below to hide his identity, which was understood to be of pivotal concern. Thus, the effort of my colleagues to preserve juror anonymity, usually entirely appropriate, is misguided in this case. As counsel and the trial court perceived, the propriety of Juror One sitting on this jury cannot be properly evaluated without knowing who Juror One is.
¶87 To be clear, the formidable Sergeant Mangelson was a very effective warrior on the Utah front of the war on drugs. See Donald J. Eyre, “Max 25” is Retiring—the End of an Era in Utah Law Enforcement, 19 Utah Bar J. 33 (July/Aug. 2006), https://www. utahbar.org/wp-content/uploads/2014/10/ 2006_july_aug.pdf. He was involved in at least thirty-three cases, see id. at 35, and who knows how many stops that never resulted in an arrest, see, e.g., Ted Cilwick, ACLU Suit Says 2 Troopers Stop Hispanic Repeatedly, Salt Lake Tribune, June 12, 1993, at B3 (reporting that Sergeant Mangel-son and another officer allegedly pulled a man over on a stretch of 1-15 between West Valley City and Las Vegas seven times between 1990 and 1993, resulting in only one warning citation and one nonconsensual search of the man’s vehicle); that never went to trial; or that never went up on appeal.
¶88 But contrary to defense counsel’s expressed view, Sergeant Mangelson was not necessarily an expert on the Fourth Amendment or well versed in its requirements. See Ted Cilwick, “Super Cop” Boon or Bust to Drug Fight? “Super Cop” Is Boon to Drug Fight, but May Be Constitutional Bust, Salt Lake Tribune, May 3, 1992, at A1 (quoting Sergeant Mangelson as stating the following justification for his tactics: “The judges are blind to what goes on out here.... Should we sit here and do nothing? The majority of people are behind us. They want us to keep hammering them. If it was up to a lot of *457 people, they’d have us search all of them.”). And there was no basis in fact for defense counsel’s expressed belief that Sergeant Mangelson would make an excellent juror because of his ability to distinguish between legal stops and illegal ones. Indeed, many of his stops were determined to be illegal. See United States v. Wald, 216 F.3d 1222, 1224, 1229 (10th Cir. 2000) (holding search of defendant’s trank, after Sergeant Mangelson pulled him over for a badly cracked windshield, was unconstitutional because there was no consent or probable cause for the search); United States v. Fernandez, 18 F.3d 874, 875-76, 880 (10th Cir. 1994) (concluding detention of defendant after a lawful stop, where Sergeant Mangelson responded as back-up, was illegal because the defendant was detained beyond the time necessary to issue the traffic citation upon which the stop was premised); United States v. Lyons, 7 F.3d 973, 976 (10th Cir. 1993) (concluding that stop of defendant to assess whether his weaving between lanes was due to impairment was illegal because, as Sergeant Man-gelson testified, he relied on a “sixth sense” to determine whether defendant was impaired and cited only a “withdrawn look” in his eyes as evidence of said impairment), overmled by United States v. Botero-Ospina, 71 F.3d 783, 786-87 (10th Cir. 1995) (rejecting the pretext stop doctrine upon which Lyons was based); United States v. Farias, 43 F.Supp.2d 1276, 1282-85 (D. Utah 1999) (concluding detention of defendant after a lawful stop was illegal because Sergeant Mangelson kept defendant longer than necessary while asking questions unrelated to the alleged reason for the stop in pursuit of “a hunch”); Sims v. Tax Comm’n, 841 P.2d 6, 8-9 (Utah 1992) (concluding that a roadblock stop “planned and supervised” by Sergeant Mangelson, State v. Sims, 808 P.2d 141, 142 (Utah Ct. App. 1991); see Sims v. Tax Comm’n, 841 P.2d at 8 n.1, “was unconstitutional under the Utah Constitution” because the roadblock was not authorized by statute or based on an “articulable, individualized suspicion of wrongdoing” but was planned in advance by Sergeant Mangelson, without exigent circumstances, for investigatory purposes); State v. Park, 810 P.2d 456, 456-57, 459 (Utah Ct. App. 1991) (per curiam) (concluding a roadblock stop made by Sergeant Mangelson violated the Fourth Amendment when the stop was used to pressure defendant for consent to search the vehicle, and suppressing marijuana confiscated in a subsequent search); State v. Kitchen, 808 P.2d 1127, 1130-31 (Utah Ct. App. 1991) (concluding a roadblock stop violated the Fourth Amendment when there was no evidence the roadblock advanced the public interest and when Sergeant Mangelson, rather than a neutral body, planned it and also carried it out, based on guidelines only for the particular roadblock in question, and absent guidelines to “prevent arbitrary invasions” of the drivers’ rights) (citation and internal quotation marks omitted); State v. Arroyo, 770 P.2d 153, 155 (Utah Ct. App. 1989) (concluding Sergeant Mangelson’s stop of defendant for following too closely was illegal because it was pretext for a drug search), rev’d on other grounds, 796 P.2d 684, 692 (Utah 1990); State v. Baird, 763 P.2d 1214, 1217 (Utah Ct. App. 1988) (concluding that Sergeant Mangelson had no reasonable articulable suspicion to stop a vehicle that was driving within the speed limit when he stopped the car because “ ‘something just struck me funny about it’ ”).
¶89 In a case like this one, Sergeant Man-gelson’s impartiality could, to put it mildly, be reasonably questioned, and it was inexcusable for defense counsel not to have moved that Sergeant Mangelson be excused for cause, a motion that would have been granted without the trial judge batting an eye. Indeed, extraordinary though it is, I would go so far as to say that the trial court plainly erred in not striking Sergeant Mangelson from the venire on its own motion, if it came to that, so obvious was his unsuitability to serve on the jury in this case.
¶90 On the record before us, defense counsel’s dereliction of duty violated his client’s Sixth Amendment right to the effective assistance of counsel. Sergeant Mangelson had no business being on the jury that convicted Martinez-Castellanos. The prejudice in this case is so palpable on both scores that Martinez-Castellanos’s entitlement to a new trial is in no sense a close question.

. Rule 11(h) provides as follows:
(h) Correction or modification of the record. If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is misstated or is omitted from the record by error, by accident, or because the appellant did not order a transcript of proceedings that the appellee needs to respond to issues raised in the Brief of Appellant, the parties by stipulation, the trial court, or the appellate court, either before or after the record is transmitted, may direct that the omission or misstatement be corrected and if necessary that a supplemental record be certified and transmitted. The moving party, or the court if it is acting on its own initiative, shall serve on the parties a statement of the proposed changes. Within 10 days after service, any party may serve objections to the proposed changes. All other questions as to the form and content of the record shall be presented to the appellate court.
Utah R. App. P. 11(h) (emphasis added).

. Defense counsel’s cavalier approach to his briefing obligations in this case is not aberrational. On the contrary, as the result of a history of ignoring his briefing obligations, he was previously barred from practice before the appellate courts of this state for a period of three years. See State v. Smith, 2010 UT App 231, ¶¶ 5-6, 238 P.3d 1103 (per curiam).