**UNITED STATES of America,
Plaintiff,**

v.

**Johnny Shane WRIGHT, a/k/a
Shane Wright, and Michael
W. Hopkins, Defendants.**

Nos. 00–4024–01–SAC, 00–4024–05–SAC.

United States District Court,
D. Kansas.

Sept. 26, 2001.

Donald R. Hoffman, Hoffman & Hoffman, Topeka, KS, Linda Rochelle Mitchell, Silver Lake, KS, for Johnny Shane Wright.

Stephen W. Kessler, Topeka, KS, for Michael W. Hopkins.

Michael W. Hopkins, Galena, KS, pro se.

Anthony W. Mattivi, Office of U.S. Atty., Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the defendant Michael Hopkins' motion to suppress evidence (Dk.585) and the defendant Johnny Shane Wright's motion to suppress evidence (Dk.712). Both defendants seek to suppress evidence seized during a traffic stop on January 26, 2000. The defendant Hopkins also asks for suppression of evidence seized from his residence on March 27, 2000, during the execution of a search warrant. The defendant Wright also asks for suppression of the evidence seized from his automobile following his arrest on March 27, 2000. The government opposes both motions with separate memoranda. (Dks.666, 740). At the hearing on July 26, 2001, the parties presented evidence and arguments in support of their respective positions. The court also permitted the parties to file supplemental memoranda. After weighing the evidence and arguments submitted and researching the relevant law, the court enters the following as its ruling on these pending motions.

### TRAFFIC STOP ON JANUARY 26, 2000

*FACTS*

In the latter half of 1999, state and federal agents were investigating several individuals for their possible involvement in the production and trafficking of methamphetamine in southeast Kansas. Preliminary information identified Johnny Shane Wright as a methamphetamine manufacturer and Michael Hopkins as a close associate of Wright's in the manufacture and distribution of methamphetamine.

During the investigation, officers gained information from authorized wiretaps on the telephones of Johnny Shane Wright. On the evening of December 10, 1999, agents intercepted a call from Wright to

Shane Newman in which they discussed money which Newman owed Wright, Newman's financial problems caused by persons not paying their debts, "cut" which Wright had provided to Newman for the apparent purpose of diluting drugs, Newman's brother having visited Wright and wanting something from him, and information about others arrested on drug charges and whether they were cooperating with the police. From this conversation, Special Agent Robert Ryan concluded that Newman had received drugs from Wright on prior occasions, that Newman owed Wright money from prior drug deals, and that Newman was wanting to get drugs from Wright in order to resume his business of distributing drugs.

On January 14, 2000, Wright telephoned Newman during which they talked about a recent traffic stop of Carroll Flowers following his departure from Wright's residence. Newman said that he wanted to visit Wright on the fifteenth but that he didn't know if Wright wanted anybody coming by his place. Though initially concerned after the Flowers' traffic stop, Wright said he didn't believe there was any police activity or surveillance involving him.

On January 20, 2000, Newman telephoned Wright and, as interpreted by Agent Ryan, placed an order for drugs indicating he had some customers lined up and that he also had $5,000 available. Wright responded that he didn't know when he would be ready to complete the transaction because he was caring for his ill wife. Newman wanted to know how much Wright would be charging for the "carburetor," and Wright answered that he didn't know as it depended on "whatever it works out to be." (Govt. Ex. 2; 067621). Newman said he would call back after the weekend if Wright did not call first.

On January 26, 2000, Newman called Wright's residence and left a message for Shane Wright to call him. Wright returned Newman's call that afternoon. Wright said he had contacted "Mike" and they "were getting ready" to visit Newman. Wright asked for directions, and Newman instructed him on how to drive to a furniture store in Camdenton, Missouri, where Newman apparently worked. Wright said he needed to visit with "Witt" first then they would be leaving.

Based on these intercepted calls, Agent Ryan believed that Wright would be traveling with Mike Hopkins to Camdenton, Missouri, on January 26, 2000, for the purpose of delivering drugs to Newman which he had ordered on January 20, 2000. Investigating agents decided to arrange for a traffic stop of Wright's vehicle before he reached Camdenton. A call to the Missouri Highway Patrol resulted in a trooper standing by in the Springfield area to conduct the traffic stop. Sergeant J.R. McMullin, a trooper with the Missouri Highway Patrol for the last twenty-two years, was told by Corporal T .J. Stevens that a van with Kansas plates traveling eastbound on I–44 would be carrying methamphetamine. Sergeant McMullin was instructed to stop the van in the vicinity of Springfield, Missouri, upon observing a traffic violation.

Through the interception of other telephone calls, agents located Wright at Melissa Bunce's residence and maintained surveillance of Wright's vehicle, a 1995 Nissan Quest mini-van, as it left Galena, Kansas, around 4:55 p.m. on January 26, 2000. Agents following the mini-van observed it heading east on Interstate Highway I–44 consistent with the route provided in Newman's instructions to Wright. Sergeant J.R. McMullin, driving an unmarked car, was waiting at an interstate overpass when he was radioed and given the specific de-

scription of the mini-van. He then began following the mini-van, and after two and one-half miles or more he stopped it for failure to maintain a single lane of traffic and failure to signal a lane change. Sergeant McMullin observed the mini-van drift several times towards the center line and then move back to the right. On one of those occasions, the mini-van's tires actually rode on the center line. He observed nothing in the lane that would have caused the mini-van to swerve onto the center line. Sergeant McMullin testified that a car moves into the other lane when its tires ride onto the line separating the lanes.

Following his normal practice, Sergeant McMullin approached the stopped mini-van on its passenger side and asked for the driver's license and the vehicle's registration. The passenger, Shane Wright, handed over some paperwork that demonstrated the vehicle was insured, and he also explained that the mini-van belonged to his parents. Sergeant McMullin observed a small brown tote bag that the passenger Wright had tightly pressed against the seat with his feet. By the way in which Wright was trying to conceal the bag, McMullin believed the narcotics were possibly in the bag.

When the driver, Michael Hopkins, had difficulty removing the license from his billfold, he was asked to join Sergeant McMullin in the patrol car. He checked Hopkins' license and told him the purpose of the traffic stop. Hopkins explained that he didn't have any difficulties with driving but that the mini-van pulled to the left. In response to McMullin's inquiry about travel plans, Hopkins said they were headed to Camdenton, Missouri, to visit their friend and spend the night at the home of their friend's mom. McMullin observed that Hopkins appeared uncomfortable and nervous. McMullin wrote a warning citation for Hopkins and ran a computer check on the mini-van but not Hopkins' license. The computer check showed the mini-van belonged to Dan Pennock of Galena, Kansas, matching the owner on the paperwork furnished by Wright. After completing the warning, McMullin returned the driver's license to Hopkins but did not furnish any copy of the warning citation as these citations are maintained only for reporting purposes.

Finished with Hopkins, Sergeant McMullin left him in the patrol car without any instructions and without saying that he was free to go. McMullin returned to the mini-van, opened the passenger door, and asked for identification from Wright. McMullin testified that opening the passenger's door in this situation is a routine procedure for officer safety. When asked about their travel plans, Wright said that he wasn't sure where they were headed but that they would be visiting a friend of Hopkins and then returning home later that night. Again noticing that Wright's feet had the tote bag tightly pinned against his seat, Sergeant McMullin asked whether there was anything illegal in the car, any guns or drugs. Wright answered, "no," and then did not respond to McMullin's inquiry about the contents of the tote bag. McMullin next asked for consent to search the mini-van, but Wright denied permission. When McMullin said he would call for a canine, Wright replied that he had a gun in the tote bag. Out of concerns for his safety, McMullin immediately grabbed the bag and refused Wright's request to have him locate the gun. McMullin stepped away from the car and unzipped one side of the bag to find a pistol and three loaded magazines and unzipped the other side to find two baggies of white powder that he believed to be methamphetamine.

McMullin arrested Hopkins and Wright and administered the *Miranda* warning to

both. They were transported to headquarters and released to another officer for questioning about the incident. Subsequent analysis of the substances found in the bag showed that one bag contained extremely pure (96%) methamphetamine and the other bag contained a common cutting agent. A search of the van also revealed a police scanner and a slip of paper on which were listed police channels.

## VALIDITY OF THE TRAFFIC STOP

### Argument

The defendants contend Sergeant McMullin lacked probable cause to believe a traffic law had been violated when he pulled over the mini-van. Drifting from one side to another of a traffic lane is not a traffic violation and does not afford an officer probable cause to stop the vehicle. Even assuming a traffic violation occurred, the defendants insist the traffic stop was a mere "pretext" to avoid the hurdle of getting a valid and lawful search warrant. The defendants emphasize the evidence showing that the traffic stop was planned. The government challenges Wright's standing to contest the traffic stop and maintains the stop was lawful and valid in all regards.

The government submits that specific information obtained through the interception of calls made to and from the defendant Wright's telephones provided McMullin with not only reasonable suspicion but also probable cause to believe the mini-van was transporting drugs at the time he stopped it. Alternatively, the government argues that Sergeant McMullin properly stopped the mini-van after observing it commit two traffic violations. That Sergeant McMullin also had other motives for stopping the mini-van is irrelevant, for the Supreme Court has recognized the traffic stop when used in this way to be a valid law enforcement investigative tool.

### Governing Law

In a prior order filed July 17, 2001, the court outlined the law governing the validity of a traffic stop for failure to maintain a single lane of traffic. (Dk.940). In an effort to save paper and resources, the court incorporates by reference that detailed statement of the law (Dk.940, pp. 9–17) for purposes of this order.

 The government's argument is not well taken that the defendant Wright has not established standing to contest the lawfulness of the traffic stop. While it is true that a passenger may lack standing to contest the search of the vehicle in which he was riding, See United States v. Eylicio–Montoya, 70 F.3d 1158, 1162 (10th Cir. 1995), a passenger does have standing to "challenge a constitutionally improper traffic stop, detention, or arrest on Fourth Amendment grounds even though, when the seizure occurs, [he] has no possessory or ownership interest in either the vehicle in which [he] is riding or in its contents." Id. at 1164. If the physical evidence found in the vehicle was the fruit of the defendant's unlawful detention, it must be suppressed. Id. at 1164–65. This requires a two part inquiry: first, whether the defendants were unlawfully detained, and second, whether the discovered evidence was the fruit of that unlawful detention. United States v. Miller, 84 F.3d 1244, 1250 (10th Cir.), cert. denied, 519 U.S. 985, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996). Only if both of those questions are answered in the affirmative will the physical evidence found in the vehicles be suppressed. United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir.1996).

### Analysis

 The particular facts and circumstances of this case establish that Sergeant McMullin observed the mini-van commit a traffic violation when it failed to maintain a

single lane of traffic in violation of Mo.Rev. Stat. § 304.015.[1] What the defendants argue legally and factually, singularly and in combination, do not dissuade this court from making this conclusion. There is nothing about the road or weather conditions to explain the swerve. The driver Hopkins never disputed that the mini-van was swerving and offered his own reason for the drifting. It is irrelevant under the Fourth Amendment that Sergeant McMullen had other subjective reasons for stopping Wright and Hopkins. *United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir.1995) (en banc), *cert. denied,* 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996). The court's "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (quoting *Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)).

■ Even assuming the driving maneuver here did not violate a Missouri statute, Sergeant McMullin did have reasonable suspicion, if not probable cause, to believe that the defendants were transporting drugs to Shane Newman in Camdenton, Missouri, based on the intercepted telephone calls and on the surveillance leading up to the traffic stop. "The *Terry* rationale also permits police officers to stop a moving automobile based on a reasonable suspicion that its occupants are violating the law." *United States v. Williams,* 876 F.2d 1521, 1524 (11th Cir. 1989) (citations omitted). The reasonable suspicion needed to justify a traffic stop can come from the collective knowledge of those officers involved in the investigation. *United States v. Guebara,* —— F.3d ——, 2001 WL 617609, at *2 (10th Cir. June 5, 2001) (Table); *see United States v. Hinojos,* 107 F.3d 765, 768 (10th Cir.1997) ("[W]e have held under the 'fellow officer' rule · that law enforcement officers may pool their information and that reasonable suspicion is to be determined on the basis of the collective knowledge of all the officers involved." (citation omitted)). "It is well-established that when an order to stop or arrest a suspect is communicated to officers in the field, the underlying facts constituting probable cause or reasonable suspicion need not be communicated, so long as the individual or agency issuing the order can justify the intrusion on Fourth Amendment rights." *United States v. Shareef,* 100 F.3d at 1503 n. 4 (citation omitted). The telephone calls between Newman and Wright intercepted before the traffic stop, as interpreted by Agent Ryan, gave the officers including Sergeant McMullin at least reasonable suspicion if not probable cause to believe that the mini-van was transporting controlled substances on January 26, 2000. Thus, Sergeant McMullin's traffic stop was valid and justified at its inception based not only on McMullin having observed a traffic violation but on the investigating officers' collective knowledge of the illicit purpose for Wright's travels as learned from the intercepted telephone calls.

---

1. This statute in pertinent part provides: "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." Mo.Rev.Stat. § 304.015.5(1) (2000). This provision is identical to K.S.A. 8–1522(a). The Missouri statute also provides: "All vehicles in motion upon a highway having two or more lanes of traffic proceeding in the same direction shall be driven in the right-hand lane except when overtaking and passing another vehicle or when preparing to make a proper left turn or when otherwise directed by traffic markings, signs or signals." Mo.Rev.Stat. § 304.015.6 (2000).

*VALIDITY OF THE DETENTION*

### Argument

We move to the second prong and the defendants' complaint that Sergeant McMullin extended the traffic stop beyond its lawful scope in questioning them about their travel plans, in asking for consent to search the mini-van, and in inquiring whether there were illegal drugs or guns in the vehicle. The defendants argue that they should have been free to go on their way after dispelling any concerns over their ability to operate a vehicle and after showing a valid driver's license. In support of their argument, the defendants admit relying heavily on the panel decision in *United States v. Holt*, 229 F.3d 931 (10th Cir.2000), *vacated*, 264 F.3d 1215 (10th Cir. 2001) (en banc). Finally, the defendants maintain the presence of the bag between Wright's feet did not justify extending the scope of the traffic stop with additional unrelated questions.

### Governing Law

■ The second prong of the *Terry* inquiry is "whether the officer's action 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Bustillos–Munoz*, 235 F.3d 505, 512 (10th Cir.2000) (quoting *Botero–Ospina*, 71 F.3d at 786), *cert. denied*, — U.S. —, 122 S.Ct. 127, — L.Ed.2d — (2001). "Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'" *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). It must be temporary, and its scope must be carefully tailored to its underlying justification. *United States v. Gutierrez–Daniez*, 131 F.3d 939, 942 (10th Cir.1997), *cert. denied*, 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998); *United States v. Wood*, 106 F.3d 942, 945 (10th Cir.1997). During a traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States .States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir.1998). The officer may also ask about "travel plans ... and the ownership of the car." *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir.1989); *see, e.g., United States v. de la Fuente–Ramos*, 242 F.3d 391, 2000 WL 1717186 at *6 (10th Cir. Nov. 16, 2000) (Table), *cert. denied*, — U.S. —, 121 S.Ct. 1391, 149 L.Ed.2d 314 (Mar. 19, 2001); *United States v. Rodriguez*, 215 F.3d 1338, 2000 WL 639581 at *5 (10th Cir. May 18, 2000) (Table). Upon issuing the citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay or additional questioning. *United States v. Patten*, 183 F.3d at 1193; *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir.1997).

■ A longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter. *United States v. Hunnicutt*, 135 F.3d at 1349. "[I]f the officer retains the driver's license, he or she must have reasonable and articulable suspicion to question the driver about drugs." *United States v. Turner*, 928 F.2d 956, 959 (10th Cir.), *cert. denied*, 502 U.S. 881, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991). If, however, the officer continues to question the driver in the absence of either of these two circumstances then "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms." *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir.1997) (internal quotations and citation omitted).

## Analysis

■ An officer conducting a traffic stop may ask preliminary questions regarding travel plans "as a matter of course without exceeding the proper scope of a traffic stop." *United States v. Hernandez,* 93 F.3d 1493, 1499 (10th Cir.1996) (citing *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1484 (10th Cir.)), *cert. denied,* 511 U.S. 1095, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994); *see also United States v. de la Fuente–Ramos,* 242 F.3d 391, 2000 WL 1717186 at *3 (Table); *United States v. West,* 219 F.3d 1171, 1176 (10th Cir.2000) ("[Q]uestions about travel plans are routine and may be asked as a matter of course without exceeding the proper scope of a traffic stop." (quotation and citation omitted); *United States v. McSwain,* 29 F.3d 558, 561 (10th Cir.1994) (routine questions about "identity and travel plans" are not improper)). The Tenth Circuit sitting en banc recently clarified:

> Thus, it is beyond dispute that an officer may ask questions relating to the reason for the stop. Ordinarily, this also includes questions relating to the motorist's travel plans. (citations omitted). Travel plans typically are related to the purpose of a traffic stop because the motorist is traveling at the time of the stop. For example, a motorist's travel history and travel plans may help explain, or put into context, why the motorist was weaving (if tired) or speeding (if there was an urgency to the travel. (citation omitted).

*United States v. Holt,* 264 F.3d 1215, 1221 (10th Cir.2001) (en banc). The court also held in *Holt* that objective safety risks justify an officer during a routine traffic stop to ask whether there is a loaded firearm in the car even though the officer may have no reasonable suspicion about such a firearm. 264 F.3d 1215, 1221–26. ■ The en banc decision in *Holt* puts to rest the defendants' arguments

that Sergeant McMullin exceeded the scope of the stop when he asked about travel plans and weapons. Moreover, the court finds that Sergeant McMullin at least had reasonable suspicion to extend the scope of the traffic so as to ask questions about weapons or drugs. Besides the information learned from the intercepted telephone calls that the mini-van was transporting controlled substances, Sergeant McMullin's reasonable suspicion was bolstered by the occupants' conflicting accounts of their travel plans, the unusual nervousness of both occupants, and Wright's peculiar efforts at hiding the bag with his legs. From this information and after Wright's admission that the bag contained a firearm, Sergeant McMullin had objectively reasonable suspicion to believe that the bag contained a firearm and contraband. *United States v. Hishaw,* 235 F.3d 565, 570 (10th Cir.2000) (the evidence sustaining a reasonable suspicion that a person was distributing controlled substances also supports a reasonable belief that the person may be armed and dangerous), *cert. denied,* —— U.S. ——, 121 S.Ct. 2254, 150 L.Ed.2d 241 (2001). Thus, Sergeant McMullin was justified in seizing the bag and out of concern for his own safety searching all of its pockets for any weapons. *See Knowles v. Iowa,* 525 U.S. 113, 117–18, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (officers in a traffic stop may "conduct a 'Terry patdown' of the passenger compartment of a vehicle upon reasonable suspicion that an occupant is dangerous and may gain immediate control of a weapon, *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)); *United States v. Hardy,* 162 F.3d 1174, 1998 WL 704706, at *2 (10th Cir. Oct. 5, 1998) (an officer with reasonable suspicion that the driver is armed and dangerous may search bags within the area of the driver's immediate control for weapons); *United States v. Shareef,* 100 F.3d at 1502,

1506–1507 (during a traffic stop officers may "take such steps as are reasonably necessary to protect their safety," including a protective sweep of the car's passenger compartment area when there is reasonable suspicion to believe the occupants are armed). The court finds that the lawful scope of the detention here was not exceeded when McMullin posed questions about weapons and contraband and then seized the bag for the purpose of gaining immediate control of any weapons.

## WARRANTLESS SEARCH

██ The court summarily rejects the defendants' last argument that the officers should have obtained a warrant to search the mini-van as it was traveling to Missouri. Besides the logistical problems obviously presented by such a procedure, such is not a requirement under the Fourth Amendment. In *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Supreme Court "held that when federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband." *Florida v. White*, 526 U.S. 559, 563–64, 119 S.Ct. 1555, 143 L.Ed.2d 748 (1999). The court is satisfied that the intercepted telephone calls provided the officers with probable cause to believe that the mini-van contained contraband.

## SEARCH OF HOPKINS' RESIDENCE

### FACTS

At the hearing, the parties stipulated to the admission of one exhibit relevant to this search and submitted the matter after oral argument. The admitted exhibit consists of the search warrant executed on the defendant Hopkins' residence, pictures of the residence, and the affidavit of Special Agent Robert Ryan submitted in support of the warrant.

### ARGUMENT

The search warrant describes Hopkins' residence, in part, as a two-story wood frame structure: "[t]he upper story is wood and the lower story is brick." The defendant argues this description was inaccurate, as the lower story is not brick. At the hearing, the government represented that the photographs of the defendant's house accompanied the warrant application. The defendant stipulated that the photographs were of his home and essentially conceded his argument on the adequacy of the property description.[2]

The defendant also contends the affidavits in support of the warrant fail to provide sufficient and accurate information on which to base a finding of probable cause and issue a warrant. Specifically, the affidavits mention three informants but do not disclose the basis of the informants' knowledge or the efforts taken to confirm the

2. Assuming the defendant had not conceded this argument, the court would have summarily rejected it for the warrant description of the residence when considered along with the referenced application and affidavit is more than sufficient to enable officers to ascertain the place to be searched with reasonable effort. *United States v. Occhipinti*, 998 F.2d 791, 799 (10th Cir.1993). Description errors are not necessarily fatal, because this standard does not require technical accuracy. *United States v. Durk*, 149 F.3d 464, 465 (6th Cir.1998). After reviewing the evidence presented, the description on this warrant meets the particularity standard, considering the address and location of this house correctly stated in the warrant, the other detailed information accurately stated in the warrant and application, and the photographs accompanying the application. The description is more than sufficient to enable an executing officer to locate and identify the premises with reasonable effort. The court cannot find any reasonable probability that others might mistakenly search another premise because of this argued error in describing the lower story as brick.

informants' statements. The defendant contends that the intercepted phone calls between him and Wright do not incriminate him as participating in the manufacture or distribution of methamphetamine and can be interpreted as non-criminal in purpose and intent. The defendant also contests whether the affidavits provide a sufficient nexus between his residence and items related to the manufacture and distribution of methamphetamine.

*GOVERNING LAW*

Generally, a search must be made pursuant to a warrant based on probable cause. U.S. Const. amend. IV. "An affidavit in support of a search warrant must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir.2000) (citation omitted). On a motion to suppress challenging the sufficiency of an affidavit, the district court does not review the affidavit de novo but accords "great deference" to the magistrate's determination of probable cause for issuance of a warrant. *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see United States v. Edmonson*, 962 F.2d 1535, 1540 (10th Cir.1992). The reviewing court need only determine whether the magistrate had a substantial basis for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. at 236, 103 S.Ct. 2317. The magistrate must make a practical, common-sense determination from the totality of the circumstances presented whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Id.* at 238, 103 S.Ct. 2317; *see United States v. Simpson*, 152 F.3d 1241, 1246 (10th Cir.1998). "In applying the test enunciated in *Gates*, this Court has stated that the 'affidavit should be considered in a common sense, nontechnical manner ...'" *Edmonson*, 962 F.2d at 1540 (quoting *United States v. Massey*, 687 F.2d 1348, 1355 (10th Cir.1982) (citation omitted)):

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232, 103 S.Ct. 2317. The Supreme Court has found it sufficient to say that probable cause is more than a mere suspicion, but considerably less than what is necessary to convict someone. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *see United States v. Wicks*, 995 F.2d 964, 972 (10th Cir.) ("The existence of probable cause is a 'common-sense standard' requiring 'facts sufficient'" to warrant a man of reasonable caution in belief that an offense has been committed"'") (quoting *United States v. Mesa–Rincon*, 911 F.2d 1433, 1439 (10th Cir.1990) (quoting *Brinegar v. United States*, 338 U.S. 160, 174, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949))), *cert. denied*, 510 U.S. 982 (1993). Hearsay, even multiple hearsay, may be used to establish probable cause for a search warrant. *U.S. v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 874 n. 3 (10th Cir.1992).

In *Gates*, the Supreme Court abandoned the requirement that an officer set forth an informant's reliability in the affidavit. 462 U.S. at 238, 103 S.Ct. 2317. The courts are to determine an informant's credibility or reliability and basis of knowledge under a flexible totality of circumstances standard. *United States v. Smith*, 63 F.3d 956, 961 (10th Cir.1995), *judgment vacated on other grounds*, 516 U.S. 1105, 116 S.Ct. 900, 133 L.Ed.2d 834 (1996). "Veracity and basis of knowledge are not, however, rigid and immovable requirements in the finding of probable cause. A deficiency in one element may be compensated for 'by a strong showing as to the other, or by some other indicia of reliabili-

ty.'" *United States v. Corral*, 970 F.2d 719, 727 (10th Cir.1992). Consequently, the affiant need not declare the informant's reliability when the informant's statements are corroborated by extrinsic information. *United States v. Sturmoski*, 971 F.2d 452, 457 (10th Cir.1992); *see United States v. Smith*, 63 F.3d at 961.

▆▆▆▆ The evidence to support probable cause must be particularized to the defendant for which the warrant is being sought. *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." *United States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir.1990). This does not mean that the affidavit must establish "that the evidence sought will undoubtedly be found in the place to be searched." *United States v. Johnson*, 645 F.2d 865, 867–868, (10th Cir.), *cert. denied*, 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981). Rather, "[a]n affidavit in support of a search warrant must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *United States v. Danhauer*, 229 F.3d at 1006 (citation omitted). In *United States v. Reyes*, 798 F.2d 380 (10th Cir. 1986), the defendant, who sought to suppress an audio cassette tape seized from his residence, contended that the information in the affidavit used to secure the search warrant contained no specific link to his residence. The Tenth Circuit rejected the defendant's argument in these words:

> The affidavit did indicate that participants in the conspiracy maintained records regarding their activities. It is reasonable to assume that certain types of evidence would be kept at a defendants' residence and an affidavit need not contain personal observations that a defendant did keep such evidence at his residence.

798 F.2d at 382. Probable cause does not depend on an averment that criminal activity actually occurred at a requested location. *United States v. $149,442.43 in U.S. Currency*, 965 F.2d at 874. The affidavit supporting the search of a suspect's residence is sufficient when it describes circumstances from which a person of reasonable caution could infer that evidence or contraband will be found there. *Id.* "[C]ourts often rely on the opinion of police officers as to where contraband may be kept." *Id.* (citation omitted). "Where a suspect has no place of business separate from this residence, it is reasonable for an officer to conclude that evidence may be at the suspect's residence." *Id.* (citation omitted).

*ANALYSIS*

▆▆▆ The detailed affidavit of Agent Ryan sets out the three confidential sources, the basis of their knowledge, and/or the independent corroboration of their serious allegations. The affidavit demonstrates that two of the three confidential sources had meaningful and substantial ties to those involved in the drug conspiracy being investigated. Such proof comes from the sources having actually engaged in illicit activities and/or discussed the same with those connected to the conspiracy while being monitored by agents acting in an undercover capacity. The third confidential source gave detailed information that was consistent with the other confidential sources. The affidavit lays out that all three confidential sources gave information based on their personal involvement with or connection to the drug conspiracy and/or to the persons involved in the conspiracy. Each confidential source not only corroborated the other's information but also identified the defendant Hopkins as a close associate of

Wright's in the manufacture and distribution of methamphetamine. The confidential sources' allegations regarding Hopkins' role in this criminal activity are corroborated by the intercepted telephone calls that have been interpreted by trained and experienced officers in this field of drug enforcement and by Hopkins' role in driving the mini-van on January 26, 2000, in an apparent effort to assist Wright in delivering methamphetamine to Shane Newman. The court finds that the affidavit provides sufficient independent corroboration of the confidential sources's information and the basis of their knowledge.

■■■ The court is also satisfied that the affidavit provides probable cause of a nexus between the criminal activity and the defendant's residence. Paragraphs three and four of the affidavit summarizes the affiant's knowledge from training and experience on what physical evidence of drug trafficking likely exists and where the traffickers are likely to maintain or secrete it. The confidential sources described the defendant Hopkins' trusted and active role in Wright's conspiracy, "one of the 'right-hand men.'" Hopkins used his residence telephone to call Wright about matters related to the drug conspiracy, including warnings about law enforcement officers being in the vicinity. Intercepted telephone calls offer proof that Hopkins went to Wright's residence for the purpose of assisting in the manufacture of methamphetamine, that Hopkins carried large amounts of cash on his person, that Hopkins possessed drugs including a secret stash in his truck, that Hopkins had retrieved items needed by Wright in the manufacture of methamphetamine, and that Hopkins assisted in Wright in transporting the methamphetamine. It a matter of fair and normal inference based upon Hopkins' extensive and ongoing involvement in Wright's drug conspiracy that evidence of the same would be found at Hopkins' residence. *See United States*

*v. Gant,* 759 F.2d 484, 488 (5th Cir.) (holding that "the nexus between the place to be searched and the evidence sought may be established through normal inferences about the location of evidence."), *cert. denied,* 474 U.S. 851, 106 S.Ct. 149, 88 L.Ed.2d 123 (1985); *see also United States v. Thomas,* 757 F.2d 1359, 1367 (2d Cir.) (holding that "[p]robable cause to believe certain items will be found in a specific location is a 'practical, nontechnical conception,' *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), that need not be based on direct, first-hand, or 'hard' evidence."), *rehg. denied,* 338 U.S. 839, 70 S.Ct. 31. Under the totality of the circumstances, the issuing judge in this case had a substantial basis from the affidavit for concluding that there was a fair probability that contraband or evidence would be found in Hopkins' house.

Even if the affidavit had been found insufficient, the court would uphold the search as the officers executing the search warrant acted with objective good-faith belief that the warrant was properly issued by a neutral magistrate. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405 (1984). In making this determination, the court "must examine the underlying documents to determine whether they are 'devoid of factual support.'" *United States v. Danhauer,* 229 F.3d at 1006 (quoting *United States v. McKneely,* 6 F.3d 1447, 1454 (10th Cir.1993)). The affidavit here is not so lacking in indicia of probable cause that the executing officers should have known the search was illegal despite the issuing judge's authorization. *See Leon,* 468 U.S. at 922 n. 23, 104 S.Ct. 3405. The affidavit contained corroborated information from three reliable confidential sources, from calls intercepted over a four-month period, and from illicit activities actually witnessed by trained and experienced law enforcement officers. A

reasonably well-trained officer would have believed this affidavit was sufficient for a lawful search warrant. The "good-faith" exception plainly applies here.

### SEARCH OF MINI–VAN FOLLOWING ARREST

*FACTS*

On March 27, 2000, Special Agent Tim Botts with the Kansas Bureau of Investigation and Trooper Grasl with the Kansas Highway Patrol were instructed to execute an arrest warrant on Shane Wright. These officers also were instructed to seize and hold those vehicles for which there was probable cause to believe they had been used to transport drugs. The mini-van involved in the traffic stop on January 26, 2000, was specifically listed as one of the vehicles to be seized for forfeiture purposes.

Officers conducting aerial surveillance on March 27, 2000, observed this mini-van at the residence of Tracy Wright's parents. Shane and Tracy Wright were arrested at this residence, and the officers seized the mini-van at that time. The mini-van was transported to Joplin, Missouri, and officers searched it pursuant to that seizure.

*ARGUMENTS*

The defendant Wright argues this warrantless search of the mini-van on March 27, 2000, cannot be justified as a search incident to an arrest or as a consensual search. The government responds that officers executing the arrest warrant for Wright recognized the mini-van as the vehicle Wright had used to transport methamphetamine on January 26, 2000. Consequently, officers seized the mini-van for forfeiture by the DEA.

*ANALYSIS*

■ As for Wright's standing to challenge the search of the mini-van, the government insists there is an issue. To have sufficient Fourth Amendment interests to challenge the search directly, the defendant Wright must show that he had an "expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 472, 142 L.Ed.2d 373 (1998). The defendant must meet his "burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir.1989) (quoting *United States v. Skowronski*, 827 F.2d 1414, 1418 (10th Cir. 1987)). The defendant must claim either legitimate ownership or possession of the car. *See id.* at 271. Through the testimony of Agent Ryan regarding the defendant's frequent and almost exclusive use of the mini-van, the defendant Wright legitimately possessed it on March 27, 2000. The court finds that Wright has standing to challenge this seizure and search of the mini-van.

■ The Fourth Amendment does not require a warrant before officers may seize an automobile from a public place when they have probable cause to believe it is contraband subject to forfeiture. *Florida v. White*, 526 U.S. at 561, 565–66, 119 S.Ct. 1555. Agent Botts and Trooper Grasl, by reason of their own knowledge or the collective knowledge of those involved in the investigation, had probable cause to believe the mini-van was subject to forfeiture in having been used on January 26, 2000, to transport methamphetamine. "Vehicles used to facilitate drug transactions are forfeitable to the United States." *United States v. Rankin*, 261 F.3d 735, 739 (8th Cir.2001) (citing *United States v. Walker*, 900 F.2d 1201, 1204 (8th Cir.1990). In executing the arrest warrant issued for the defendant Wright, both officers were lawfully on the property where the mini-van was parked.

1210

"A warrantless inventory search, however, is justified after the forfeiture of a vehicle...." *United States v. Leopard,* 936 F.2d 1138, 1142 (10th Cir.1991) (citations omitted). The uncontroverted testimony of Agent Ryan is that the mini-van was seized by officers on March 27th, transported to the processing location in Joplin, Missouri, and was searched on that day pursuant to this forfeiture. The defendant Wright does not challenge the substance or sufficiency of this testimony in proving that the search here was a lawful inventory search. Based on the undisputed weight of the evidence, the court finds that the mini-van was lawfully seized and subsequently searched pursuant to a lawful inventory search process.

IT IS THEREFORE ORDERED that the defendant Michael Hopkins' motion to suppress evidence (Dk.585) and the defendant Johnny Shane Wright's motion to suppress evidence (Dk.712) are denied.